HOUSER, J.
 

 Although not in complete harmony with the testimony that was given by each of the several “eye-witnesses ’ ’ to the important incidents which preceded and led to the death of one Price at the hands of defendant, an examination of the transcript of the evidence that was adduced on the trial of the action warrants the conclusion that the jury was justified in its implied belief that the following facts had been established, to wit:
 

 So-called “Negro Quarters” are situated in a “clearing” that lies about three-fourths of a mile from the town of Quincy. Apparently the “quarters” consist of two rows of small houses or cabins, in size about fifteen by twenty feet, one row being opposite the other. Number 13, of one of such rows, was occupied by defendant and his wife. A man named Bullock with his wife, lived in number 11, which was separated from number 13 by a distance of about sixty-eight and one-half feet, within which intervening space one other cabin, number 12, was located. At approximately 7:30 o’clock P. M. on a day in the latter part of June, while it was “first dusk”, at a point near the rear of Bullock’s cabin (number 11), defendant accosted Price in a friendly manner and then and there in the presence of Bullock asked Price to repay to defendant the sum of one dollar which he asserted that Price owed to him. To that suggestion, Price responded that theretofore he had paid that amount to the defendant and
 
 *614
 
 urged defendant to go with him to see a Mrs. Smith, by whom Price declared that he could “prove” the correctness of that statement. Defendant declined and refused to be thus convinced of his asserted error with reference to his claim on Price. Although aside from the fact that each told the other that he was “crazy”, neither defendant nor Price “spoke a cross word”. Immediately following that “quarrel” defendant went to his cabin (number 13) and Price accompanied Bullock to the front of the cabin that was occupied by the latter (number 11), where they found Mrs. Bullock seated upon a bench and upon which both Price and Bullock also thereupon sat. Within two or three minutes (or possibly three or four minutes) next ensuing, Price arose and went to one comer of the cabin that was occupied by defendant, where in a listening attitude he remained for a space of three or four minutes; thereupon he entered defendant’s cabin. A few minutes later, upon emerging therefrom he carried an unloaded rifle that was the property of defendant. Thereupon he returned to the seat that theretofore had been occupied by him on the bench that was located in front of Bullock’s cabin. At that time and place Bullock, his wife and another woman (Price’s housekeeper) were present. Within “quite a few minutes” thereafter, defendant’s wife joined those who were thus assembled and then and there asked Price to give to her not only the dollar which defendant had asserted that Price owed to him, but also defendant’s rifle whielj Price had retained in his possession. To that request Price replied, “I don’t owe Wells (defendant) no dollar; I paid the dollar. I ain’t going to give you the gun; I will keep the gun”. And as further was stated by the witness who gave that testimony, “While she was prevailing with Price for the gun Mr. Wells (defendant) come out and yelled ‘Look out!’ The gun (in the hands of defendant) went off when I got off the bench . . . By the time I got three or four feet from the back end of the house he made the second shot . . . By the time she (Bullock’s wife) got in (the rear door of the cabin) and I fastened the door the third shot went off”.
 

 With reference to the circumstances which resulted in the fact that Price had possession of a rifle that was the property of defendant, Price’s housekeeper testified in substance that after Price had left the front of Bullock’s cabin, she joined Price and as they were about to pass in front of that cabin
 
 *615
 
 "they” saw defendant inside his cabin with the rifle in his hand, apparently on his way through the front door entrance of his cabin to the outside thereof; that thereupon Price said "he couldn’t out run that” and went into defendant’s cabin, "grabbed hold” of the rifle that defendant held in his hands, and after a struggle with defendant, succeeded in wresting it from his possession; that in the course of that struggle, Price said to defendant "Why do you want to hurt me. I don’t want to hurt you”; that thereupon Price "come on out and told Wells ‘Why act like that?' ”; and that after Price had gone back to the front of Bullock’s cabin, in substance he said to Mrs. Bullock, "Don't run home, girl. I am not going to hurt anybody.” He said, "I am not going to hurt nobody and I don’t want nobody to hurt me”. And that in answer to the request made of Price by Mrs. Wells two or three minutes afterward, that he give defendant’s rifle to her, Price said, "I will not give it to you; I want no trouble; I don’t want to hurt Wells. I don’t want Wells to hurt me; I am not going to hurt him.”
 

 Defendant was not sworn as a witness; but in his behalf, with reference to the incident in which it appeared that Price wrested the rifle from defendant, the wife of defendant testified:
 

 "When Wells walked in (after the quarrel) Stella Vaughn (Price’s housekeeper) and myself was sitting in the kitchen talking and he went on through to the bedroom; so after he was in there awhile I got up and went in—while talking to Estella. When I was in there talking to Wells Stella says ‘Net, I’m going, I will be back', and shortly after that Price walked in the back door. Someone knocked at the back door; I said ‘who is that’. He didn’t say anything, so Wells said ‘don’t come in here Price, don’t come in here.’ Then Price went on around to the front door and I heard him and then I pulled the door open and I said ‘Price, don’t come in here, don’t come in here Price’. Wells said ‘don't come in here’. When he got to the middle door to come into the bedroom Wells said ‘didn’t I tell you not to come in here’. When he did that he jumped and Wells got the gun. Shoved Wells on the bed and they were fussing in there about five minutes before Stella came in. When he taken the gun he walked out and Stella walked out behind him and I was behind Estella. I walked out and told Wells ‘I will get the gun’ and while I went out to get the gun and while talking to Price
 
 *616
 
 to give me the gun, while standing in front of him, and Price said ‘No, Home girl, I will not give it to you.’ I said ‘give me the gun’; he said: ‘I will not give it to you.' I said ‘don’t you owe Wells a dollar’; he says ‘no’, and at that time Wells said ‘look out’. Q. Then there was a shot fired? A. Then there was a shot fired.”
 

 It also appears that after defendant had fired the first shot from his shotgun, and all the persons, including Price, that immediately theretofore had been in front of Bullock’s cabin, in an attempt to escape injury, had run each in a direction different from that which was taken by either of the others, defendant followed Price and fired two additional shots from the shotgun. Within a few minutes thereafter Price was found dead, with defendant’s unloaded riñe clutched in his right hand. It is unquestioned that his death was the result of his having been shot by defendant.
 

 On such evidence, without making any recommendation regarding the punishment that should be inflicted upon the defendant, the jury returned its verdict of ‘ ‘ guilty of murder in the first degree”. It is from the ensuing judgment, as well as from an order by which defendant’s motion for a new trial was denied, also from an order by which was denied defendant’s motion that the judgment be modified by reducing the degree of the crime either to murder in the second degree, or to the crime of manslaughter, that the instant appeal has been taken.
 

 Citing
 
 People
 
 v.
 
 Howard,
 
 211 Cal. 322, 328, 329 [295 Pac. 333, 71 A. L. R. 1385], as authority, appellant contends that although it be conceded that defendant killed Price, nevertheless ‘‘that no express malice aforethought was shown”. Consideration of the text of the authority to which appellant has referred discloses the fact that it consists of the substance of sections 187, 188 and 189 of the Penal Code, together with a condensation of respective rulings that heretofore have been made either by this court or by the District Court of Appeal in each of several cases, to wit,
 
 People
 
 v.
 
 Bellon,
 
 180 Cal. 706 [182 Pac. 420],
 
 People
 
 v.
 
 Knapp,
 
 71 Cal. 1 [11 Pac. 793], and
 
 People
 
 v.
 
 Ford,
 
 85 Cal. App. 258 [258 Pac. 1111], which, as far as herein is pertinent, are to the effect that ‘‘When the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder; but in
 
 *617
 
 such a. case the verdict should be murder of the second degree, and not murder of the first degree".
 

 By the terms of the several statutes to which reference hereinbefore lias been had, it is obvious that whenever it has been established that with malice aforethought a human being has been unlawfully deprived of his life, the crime of murder has been committed; and that the necessary element of malice "is manifested" when it appears that the killing was the result of "a deliberate intention unlawfully to take away the life of a fellow-creature". And in substance the pertinent provisions of section 1105, Penal Code, are to the effect that when the commission of a homicide has been established, "the burden of proving circumstances of mitigation, or that justify or excuse it", devolves upon the defendant. Or as is amplified in the case of
 
 People
 
 v.
 
 Jones,
 
 160 Cal. 358, 370 [117 Pac. 176], "In the ease of murder the law has made provision peculiar to the crime. To the crime of murder malice is an essential. (Pen. Code, secs. 187, 188), but by section 1105 of the Penal Code, when the homicide by the defendant has been proved the murder is established and, of course, to establish murder the malice must be established. We have thus, in our law, the peculiar situation touching murder that proof of the homicide alone establishes the crime with its necessary ingredient of malice and immediately the burden is transferred to the defendant of proving circumstances in mitigation to lessen the degree of the crime or in justification or excuse to show that no crime has been committed. Thus, the effect of section 187 and of section 1105 of the Penal Code, construed together, is as though the law had expressly declared that while murder is the unlawful killing of a human being with malice aforethought, every killing is murder unless the defendant proves the contrary . . . In New York, ... it is held that there is never a presumption of malice in the case of a homicide and that an actual intent to kill must be shown affirmatively, whereas, by virtue of section 1105 of our code, the existence of malice is presumptively proved by proof of the killing. ... " .
 

 In each of the authorities to which reference herein-before has been had, it may be noted that the declaration by the court to the effect that in the circumstances therein assumed to exist, the crime would amount to second degree murder only, is dependent upon the fact that an unlawful
 
 *618
 
 killing and
 
 “nothing further”
 
 has been shown. In the instant ease, much more than the isolated fact that Price was unlawfully killed by defendant was thoroughly established; and considering the law, together with the evidence that hereinbefore has been summarized, it would seem clear that the conclusion of express malice of defendant was fairly deducible.
 

 As has been suggested by appellant, it may be conceded that if facts were presented by the prosecution which tended to show “circumstances of mitigation” (sec. 1105, Pen. Code), in order that defendant might have become entitled to benefit by them, he was not required to again place the same facts in evidence. However, the assumed facts, that a few minutes preceding the instant when defendant shot Price, the two men not only had “quarreled” one with the other, but also that shortly thereafter, with the apparent belief on the part of Price that with the use of a rifle defendant intended to commit some sort of a violent act upon the person of Price, the latter thereupon unlawfully had entered the home of defendant, had assaulted him, besides which had wrested the rifle from his possession, and subsequently had refused to return defendant’s property to him, were not necessarily either “circumstances of mitigation” or facts which would conclusively “justify or excuse” the commission of the offense. One of the provisions of section 192 of the Penal Code is to the effect that if “upon a sudden quarrel or heat of passion” a human being should be unlawfully killed, “without malice”, the offense thus committed will be manslaughter; otherwise, in the absence in the mind of the defendant of a deliberate and clear intent to take life, or that which has been termed as “pre-existing reflection” or “deliberate premeditation” to do so, the homicide that may be committed by him may be reduced to murder of the second degree. In other words, with respect to whether the crime was that of manslaughter only, the legal designation of the offense depends largely, if not entirely, upon the reasonable and justifiable state of mind that was present in the offender with reference to his act, either at the instant when it was committed, or so shortly before that time that reason shall not have had time “to resume its empire”; that is to say, that before the offense properly may be classed as manslaughter, it should appear that after the “heat of passion” was reasonably and justifiedly engendered, “hot blood had
 
 *619
 
 not had time to cool” before the fatal act was committed. Likewise, in order that a conclusion that the offense constituted a murder of the second degree might be sustainable, it should appear with reasonable certainty that immediately preceding the execution of his fatal act the killer had not formed a deliberate intent to take the life of the person whom he thereafter killed, or that such act was not the result of “pre-existing reflection” or “deliberate premeditation”.
 

 An examination of the instructions that were given by the trial judge to the jury discloses the fact that the so-called “stock instruction” that since the decision was rendered by this court in the case of
 
 People
 
 v.
 
 Iams,
 
 57 Cal. 115, customarily has been given in murder cases in this state, was very closely, if not literally followed. A part of the instruction that was given herein was as follows:
 

 “Murder is defined to be the unlawful killing of a human being with malice aforethought. The word malice imports a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or by presumption of law. Malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.
 

 “All murder which is perpetrated by means of poison, lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, is murder of the first degree, and all other kinds of murder are of the second degree.
 

 “The difference between murder of the first degree and murder of the second degree is: That in murder of the first degree the killing must be deliberate and premeditated, while in murder of the second degree the killing is not deliberate and premeditated. In the one case there is a deliberate, premeditated, preconceived design, though it may have been formed in the mind immediately before the mortal wound was given to take life. In the other case there is no deliberate, premeditated, preconceived design to kill. In both, however, the killing must have been unlawful and accomplished with malice.
 

 “There may be no appreciable space of time between the intention to kill and the act of killing—they may be as
 
 *620
 
 instantaneous as successive thoughts of the mind. It is only-necessary that the act of killing be preceded by, and the result of a concurrence of will, deliberation, and premeditation on the part of the slayer; and if such is the case the killing is murder of the first degree, no matter how rapidly these acts of the mind succeed each other or how quickly they may be followed by the act of killing.
 

 “Under the Information in this case the defendant may, if the evidence warrants it, be convicted of manslaughter, which is defined by our statute to be the unlawful killing of a human being without malice. It is of two kinds: first, voluntary, upon a sudden quarrel or heat of passion; and, second—involuntary, in the commission of an unlawful act which might produce death in an unlawful manner and without due caution and circumspection.
 

 “To reduce a felonious homicide from the grade of murder to that of manslaughter upon the ground of sudden quarrel or heat of passion, the provocation must be of such a character as would be naturally calculated to excite and arouse the passions, and it must appear that the party acted upon the smart of sudden passion and resentment.
 

 “If, however, the provocation was of a slight and trifling character, of such a nature as would not be calculated to arouse passion, or if sufficient time had elapsed between the provocation and the fatal shot for passion to subside and reason to resume its empire, the offense will not be mitigated, but the slayer will be guilty of murder . . .
 

 “ ... In this case if you find the defendant killed the deceased, then the burden of proving circumstances of mitigation or that justifies or excuses the homicide devolves upon the defendant, unless the proof upon the part of the prosecution tends to show that the crime committed only amounts to manslaughter or that the defendant was justified or excusable. ...”
 

 Although no question is raised by appellant either as to the correctness or to the adequacy of other instructions that were given to the jury, the record herein fails to disclose that as to each of the several issues that were involved in the action, the jury was not fairly instructed.
 

 As hereinbefore has been indicated in the quotation from the case of
 
 People
 
 v.
 
 Jones,
 
 160 Cal. 358, 370 [117 Pac. 176], the fact that an unlawful killing by the defendant may
 
 *621
 
 have been established, and in that connection that assumed “circumstances of mitigation” have been placed in evidence either by the prosecution or by the defendant, as far as the jury is concerned, they are not necessarily conclusive either as to the proof of the several items of evidence by which such “circumstances of mitigation” have been sought to be established, or as to the effect of such items taken either separately or as a whole. The jury has the right, and it is its duty, to weigh such evidence and thereupon to determine what credit, if any, it deserves, and thereupon to accord to it the weight to which it is entitled. And in so doing, should the jury conclude that the “circumstances of mitigation” either have not been satisfactorily established by credible evidence, or that even if isolated respective facts should have been satisfactorily established, their combined weight have failed to prove an ultimate fact which amounts to legal mitigation of the offense,—as a matter of additional prerogative, the jury has the right to reject the whole of such evidence and thereupon and thereafter to revert to the respective remaining questions, if any, which may relate to the two degrees of murder, together with the incidental question of recommendation of punishment, should first degree murder be the verdict. In other words, an issue either as to whether “circumstances of mitigation” have been proved to have existed at the time when the offense was committed, or whether in the language of section 189, Penal Code, the killing was the “wilful, deliberate and premeditated” act of the defendant, depends for its determination primarily upon the evidence that may have been presented in its favor, as well as that which may have been received against it; and in reaching a conclusion with reference to the matter, in the consideration of all the evidence, the jury should be guided by rules that relate to other “defenses” generally. In that connection the following excerpts which have been taken from respective texts and adjudicated cases illustrate not only such general rule, but also the rule that governs the degree of “proof” that is required to establish either “circumstances of mitigation” of the offense, or those which either justify or excuse it; that is to say: It is stated in 13 Ruling Case Law, page 909, that, “The weight and sufficiency of evidence in homicide cases are to be determined in accordance with the rules established for the governance of these matters in
 
 *622
 
 legal proceedings generally” and on page 908 that “The general rules of evidence respecting the burden and
 
 quantum
 
 of proof apply to prosecutions for homicide as well as all criminal proceedings”. (See, also, 8 Cal. Jur., p. 187.) In the latter authority it is said, “There is a marked difference in the degree of proof required to establish any fact against the defendant, and that sufficient to establish any fact in his favor. Since the prosecution is required to prove the guilt of a defendant beyond a reasonable doubt, it follows that any fact necessary to the defense confined to the original transaction on which the charge is founded only needs to be established sufficiently to create a reasonable doubt of the defendant's guilt when taken into consideration with all the evidence in the case. To require a defendant to establish his defense by a preponderance of evidence would manifestly shift the burden of proof and deprive him of the benefit of the doctrine of reasonable doubt.” Also in volume 13, California Jurisprudence, page 737, the following statement is found: “While the burden of showing the circumstances under which the homicide is mitigated, justified or excused, devolves upon the defendant, he is only bound under this rule to produce such evidence as will create in the minds of the jury a
 
 reasonable doubt
 
 of his guilt of the offense charged. He is not required to establish such circumstances by a preponderance of the evidence.” In the case of
 
 People
 
 v.
 
 Roe,
 
 189 Cal. 548, 550, 564 [209 Pac. 560], it is said: “ ‘While Sec. 1105, Penal Code, casts upon a defendant the burden of proving circumstances that justify or excuse the commission of a homicide, it does not mean that he must prove such circumstances by a preponderance of the evidence. On the contrary, while the burden of showing the circumstances under which the act is justified devolves upon a defendant, ’ he is only bound under this rule to produce ‘such evidence as will create in the minds of the jury a
 
 reasonable
 
 doubt. of his guilt of the offense charged'.” And in
 
 People
 
 v.
 
 Post,
 
 208 Cal. 433 [281 Pac. 618], it was held that the giving of an instruction which required the defendant to produce in his defense evidence of greater weight than would be sufficient to create in the minds of the jurors a
 
 reasonable doubt
 
 as to his guilt, was erroneous and declared to be “so far prejudicial as to take the case beyond the curative provisions of Sec. 4% of Art. VI, of the constitution”. And to the same effect is the language found in the ease of
 
 People
 
 v.
 
 Rodriguez,
 
 
 *623
 
 182 Cal. 197 [187 Pac. 423], wherein it is said: “The killing by the defendant being shown, the burden was upon him to explain how it happened that he took, a human life and to show any circumstances of mitigation, excuse, or justification for his act that might exist. Unless he met this burden to the extent of raising a reasonable doubt as to his being guilty of murder as distinguished from manslaughter or justifiable homicide, the verdict was justified from the fact alone that he had taken human life.” (See, also, 13 Cal. Jur., p. 735.) In 6 California Jurisprudence, 10 Year-Supplement, page 325, it is said: “It is within the power of the jury to give such weight as it deems proper to all the circumstances surrounding the commission of a homicide in determining
 
 io what extent if at all
 
 they operate as mitigating circumstances in the killing.
 
 (People
 
 v.
 
 Gebbia,
 
 138 Cal. App. 94 [31 Pac. (2d) 822].) ” Also, in 13 California Jurisprudence, page 611, it is said: “It is left to the jury to say whether the evidence is sufficient to lead them to believe, or to entertain a reasonable doubt whether the offense was committed under heat of passion. . . . While no particular cause for such heat of passion is expressly prescribed by law. . . . There must be ‘considerable’ provocation, such at least as would stir the resentment of a reasonable man. A provocation of slight and trifling character, such as words of reproach, however grievous they may be, or gestures, or an assault, or even a blow, is not recognized as sufficient to arouse, in a reasonable man, such passion as reduces an unlawful killing with a deadly weapon to manslaughter . . . ”; and on page 612, “The sufficiency of provocation to reduce a homicide from murder to manslaughter, and whether defendant did in fact act under such provocation, are questions of fact for the jury.” To the same effect is language found in 13 Ruling Case Law, page 910, as follows: “Sound policy declares that the issue of guilt or innocence is for the jury’s determination, and that appellate courts should interfere with judgments of conviction only in exceptional cases.”
 

 And so in the instant matter: For example, had the jury concluded that the effect of the “quarrel” which took place between defendant and Price, together with that which the jury believed was the truth with reference to the incident whereby it appeared that defendant’s rifle was wrested from his possession by Price, and the retention of the rifle by him after he was requested to return it to defendant, were of
 
 *624
 
 that gravity which, in the mind of an ordinarily reasonable person would have been sufficient to create therein such resentment or anger that it would amount to a “heat of passion” to the extent and duration that immediately and continuously thereafter up to the instant when the fatal act was committed by him, in effect he was mentally irresponsible,— the logical result would have been that “circumstances of mitigation” for the commission of the offense properly would have been the implied finding of fact by the jury. Likewise, with respect to the issue of whether the offense was that of murder in the second degree: It was the exclusive province of the jury to determine from the evidence whether the killing was the “wilful, deliberate and premeditated” act of defendant. In that connection, in the case of
 
 People
 
 v.
 
 Mahatch,
 
 148 Cal. 200, 203 [82 Pac. 779], in part it was said: “The jury, having found that the only extenuating circumstance which he interposed had no existence in fact, and no claim of any circumstances of mitigation, justification, or excuse for the killing being advanced, had a right to infer, from the character of the weapon used, the nature of the wound inflicted, and the acts and conduct of the accused, the existence of a deliberate purpose on his part to kill the deceased'when the fatal blow was struck, and, so inferring, were warranted in returning a verdict therefrom for murder in the first degree. This is the general, it may be said the universal, rule. If a different one prevailed, secret murders could rarely be punished by the infliction of the highest penalty. It is exclusively the province of a jury to determine the degree of crime when there is any evidence in the ease which will support the determination. We are satisfied that in the case at bar there was sufficient evidence to warrant the jury, within the rule we have stated, in inferring the existence of a deliberate intent to kill. They so found and awarded the highest penalty, and their finding was approved by the trial judge on the motion for a new trial. This is conclusive upon the subject and upon us, as we can only disturb a finding when we can say, as matter of law, that there was no evidence to support it.” (See, also,
 
 People
 
 v.
 
 Rico,
 
 180 Cal. 385 [181 Pac. 663];
 
 People
 
 v.
 
 Mc-Neer,
 
 14 Cal. App. (2d) 22, 25 [57 Pac. (2d) 1018];
 
 People
 
 v.
 
 Shaver,
 
 7 Cal. (2d) 586 [61 Pac. (2d) 1170];
 
 People
 
 v.
 
 Machuca, 158
 
 Cal. 62 [109 Pac. 886]; 13 Cal. Jur., p. 595, and cases there cited.)
 

 
 *625
 
 Considering the verdict that was returned by the jury, to wit, “guilty of murder in the first degree” (without recommendation), and particularly in view of the time that elapsed after the “quarrel” between Price and defendant had taken place, together with that which ensued after the incident that related to the seizure and the retention by Price of defendant’s rifle,—all of which preceded the instant when the first shot was fired by defendant at Price,—it becomes apparent that the jury was of the opinion and thereupon reached the conclusion not only that during the interval which succeeded those two episodes before the fatal shot was fired, had “hot blood had sufficient time to cool”, but also that following a time when presumably “reason had resumed its empire” the crime was committed
 
 “upon preexisting reflection”
 
 and was the
 
 “wilful, deliberate and premeditated”
 
 act of defendant.
 

 In that regard, the jury was instructed that
 
 “There may be no appreciable space of time between the intention to hill and the act of hilling—they may be as instantaneous as successive thoughts of the mind.
 
 It is only necessary that the act of killing be preceded by, and the result of a concurrence of will, deliberation, and premeditation on the part of the slayer; and if such is the ease the killing is murder in the first degree, no matter how rapidly these acts of the mind succeed each other or how quickly they may be followed by the act of killing.”
 

 Although with reference to the formation of “a
 
 deliberate
 
 intention unlawfully to take away the life of a fellow-creature”, (sec. 188, Pen. Code), it may seem somewhat questionable to judicially declare that no appreciable time is required for
 
 “pre-existing reflection, deliberation and premeditation”,
 
 but that to the contrary, such
 
 “pre-existing reflection, deliberation
 
 and
 
 premeditation”
 
 may be
 
 “as instantaneous as successive thoughts of the mind”,
 
 nevertheless, from “time immemorial”,' and especially since the time when it was so positively asserted in the lams case (57 Cal. 115), the rule as announced has been fixed and firmly imbedded within the foundations of statutory construction as applied to pertinent penal statutes of this state. Neither from a consideration of abstract justice, of humanity, nor even of an appreciation of the capacity of the normal human mind, is the possibility of the inaccuracy of that rule here called in question; and at least until it be directly and sue
 
 *626
 
 cessfully challenged either through or by judicial or legislative channels, it must remain a basic guide for the determination of future questions that may relate to the degree that should be attributed to the crime of murder, defined by the statute as ‘ the unlawful killing of a human being, with malice aforethought”. (Sec. 187, Pen. Code.)
 

 Notwithstanding the well-established rule of law as is announced in
 
 People
 
 v.
 
 Mahatch,
 
 148 Cal. 200 [82 Pac. 779], that “it is exclusively the province of a jury to determine the degree of crime when there is any evidence in the case which will support the determination”, in substance appellant urges the point that since the evidence herein shows that defendant was not guilty of the degree of the crime of which he was convicted, not only under the direct provisions of section 1181 of the Penal Code, but also in accord with the decisions heretofore rendered by this court in the respective cases of
 
 People
 
 v.
 
 Kelley,
 
 208 Cal. 387 [281 Pac. 609], and
 
 People
 
 v.
 
 Howard,
 
 211 Cal. 322 [295 Pac. 333, 71 A. L. R. 1385], the judgment herein should be modified by “reducing the crime” to either murder in the second degree or to that of manslaughter.
 

 In that respect, as far only as the abstract power of the court in proper situations is concerned, there can be no doubt regarding the correctness of the point that is suggested by appellant. However, from a consideration of the cases to which reference has been had, it is apparent that in first degree murder cases the authority conferred by the provisions of the statute should be exercised only where the evidence either clearly is insufficient to show anything other than that the defendant therein unlawfully killed a “human being [presumptively] with malice aforethought”, that is wilfully, deliberately and premeditatively,—or, possibly, that with respect to whether such a condition in the mind of the defendant existed, as was indirectly suggested in the latter case, when this court entertains “a doubt as to its (the evidence) showing murder of the first degree”.
 

 As hereinbefore has been indicated, this court is of the opinion that the evidence is legally sufficient to support the verdict generally that was returned by the jury. With respect to the second proposition, assuming, without here affirming the suggestion that the existence of a doubt in the “mind” of the reviewing tribunal with reference to the insufficiency of the evidence to justify the verdict as to the
 
 *627
 
 degree of the crime may constitute a valid reason for an order by which the degree of the crime as "expressed in the verdict may be reduced, nevertheless it should be made clear that the “doubt”, if any, like that universally required of the jury on the trial of a criminal action, should be not merely fanciful or imaginary, but should be reasonable, real and substantial. It is a commonly recognized fact that a very great difference may exist between two individuals with respect to their respective temperamental characteristics; that is to say, that that which to one individual may be provocative even to the degree of “a heat of passion”, to another may be only a cause for merriment. And so with the defendant in the instant action: although he may have been greatly exercised and incensed at the treatment or the assumed wrongs which theretofore he had received at the hands of Price, nevertheless the question as to whether such behavior was of that gravity and importance that, as applied to a reasonable man, situated as was the defendant, it reasonably might be anticipated that it would create or produce in his mind a “heat of passion” sufficient in intensity to connote the existence of the ultimate fact or condition of “circumstances of mitigation”, at least primarily, and in the first instance, was for the jury to determine. With that principle noted, although it well may be that one reasonable mind might differ from another with respect to whether the evidence in the instant case presented such a situation that therefrom should follow a conclusion either that the act of defendant was committed by him in the absence of deliberation and premeditation with reference thereto, or, that if said act was intentionally committed by defendant, it was done in the “heat of passion”— nevertheless, the question of whether this court has a reasonable “doubt” on the issue of the legal sufficiency of the evidence to warrant the verdict of the jury, must be answered in the negative.
 

 No other issues are presented by appellant’s brief. It follows that the judgment, and each of the orders from which defendant has appealed, should be and they are affirmed.
 

 Seawell, J., Curtis, J., Edmonds, J., Langdon, J., Shenk, J., and Waste, C. J., concurred.