[Crim. No. 3808. Second Dist., Div. Three. Jan. 17, 1945.]

THE PEOPLE, Respondent, v. ZILLA HASHAWAY, Appellant.

556

Walter L. Gordon, Jr., for Appellant.

Robert W. Kenny, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendant was accused of the crime of murder. A jury found her guilty of murder of the first degree and fixed punishment at life imprisonment. Her motion for a new trial was denied, and she was sentenced to life imprisonment. Defendant appeals from the verdict, from the "judgment" denying her motion for a new trial, and from the sentence.

Defendant contends: (1) that the evidence was insufficient to support a conviction of murder of the first degree; (2) that the trial court committed prejudicial error in admitting "purported" dying declarations of deceased; and (3) that the trial court erred prejudicially in giving an instruction concerning involuntary manslaughter.

On October 23, 1943, Ceberlee Clark was shot by defendant and died the next day (the time of day is not shown by the record). He was a special policeman, twenty-six years of age, five feet nine inches in height, and 212 pounds in weight. The weight of defendant was 118 pounds. In April, 1943, Clark moved into a hotel which was on the second floor of a building located at 815½ East 5th Street, Los Angeles. The en-

trance to the hotel was by means of a stairway in the front part of the building extending from the ground floor to the second floor. There was another stairway from the second floor to the third floor. A hallway, about three feet in width, extended from the front to the rear of the hotel, and the rooms were along each side of the hallway. At the rear end of the hallway there was a door, which opened inward. Outside the door there was a porch about two feet nine inches wide which extended across the rear of the hotel. The porch was enclosed by a railing about three feet high, and there was a stairway from the porch to the third floor, and another stairway from the porch to the ground. The stairway to the ground had been closed, and was not in use at the time of the homicide. The manager of the hotel lived in an apartment consisting of rooms 1 and 2 in the front of the building near the entrance stairway. Clark occupied room 6, which was the fourth room from the manager's apartment and was the second room from the back porch.

He and the defendant became acquainted in July or August of 1943, and two or three weeks later defendant moved into his room at the hotel. They lived there about two months, and then Clark left the state and was gone about three weeks. After he had gone, defendant continued to live in his room until the Saturday preceding the Monday when he returned. On that Saturday she moved out of the hotel. According to her testimony, she then went to live with her friend, Beatrice Terry, until she could find a place of her own, and on October 22d, she moved into an apartment on 1st Street. On the evening of October 23, 1943, about one week after Clark had returned to Los Angeles, he took a woman and a man to his room in the hotel. He left them there, and went back to the street where he saw defendant for the first time following his return. Clark told defendant there was a woman in his room. About 9:00 that evening, he and defendant went into the hotel together, defendant knocked on the entrance door to the manager's apartment, which was the door to the kitchen, and the door was opened by the manager's daughter. Defendant entered, but Clark did not enter at that time. He sat on the steps of the stairway which extended from the second to the third floor. The door of the apartment was left open when defendant entered, and Clark could be seen from the manager's apartment as he sat on the steps laughing. Defendant

asked the manager for the return of a butcher knife, which she had either given or lent to the manager while she was living in the hotel. Other statements made at that time concerning the knife will be referred to hereinafter when the testimony of certain witnesses is related. The defendant did not get the knife. A few minutes after defendant had gone into the manager's apartment, Clark entered and sat down in the kitchen. When he entered, and as he sat in the kitchen, he was laughing. At this time defendant was in the bedroom of the apartment, and she told the manager that Clark had a woman in his room. After some conversation about going to the street, hereinafter to be related, defendant and Clark left the apartment together and went into the hallway. While they were in the hallway, it appears that they had a disagreement concerning whether defendant should go into Clark's room. According to the alleged dying declaration of Clark, defendant wanted to go into his room and he would not permit her to do so. According to the testimony of defendant, Clark tried to push or force her into his room, and she resisted his efforts and refused to go in. Details concerning happenings in the hallway will be stated hereinafter when testimony of certain witnesses is related. Defendant reached into her coat pocket and ''pulled out'' a pocket knife. The handle of the knife was 3⅜ inches long; one blade was two inches long, and the other blade was 1⅞ inches long. Clark took the knife away from her, and then defendant snatched Clark's pistol from the holster which was strapped to his waist. Defendant testified that thereupon Clark took a ''billy'' from his belt, and advanced toward her with it in his upraised hand; that she retreated as far as she could—— to the railing of the porch; that he continued advancing, and she fired the pistol in self-defense. The bullet entered the left side of Clark's abdomen, about two inches below his heart, followed a horizontal course and lodged in his back. Defendant then went into the street with the pistol in her hand, and was arrested near the hotel.

The manager testified: that on the night of the homicide, she was in her apartment with her daughter and Edward Peters when defendant came to her apartment; that it was the first time she had seen defendant since she moved from the hotel; that defendant had given her the butcher knife in question; that after defendant asked for the knife, she (the

manager) looked outside and saw Clark laughing, and sitting "on the third bottom step" of the stairway, and she replied, " 'Not no knife' "; that defendant did not say why she wanted the knife; that when Clark came in the apartment, he "started a book—— turning the pages," at which time defendant was "walking around the basin" in the bedroom; that it was necessary to go through the kitchen to get to the bedroom; that Clark was laughing and appeared to be jolly while he was in her apartment; that defendant did not appear to be angry or disturbed; that she (the manager) overheard no argument of any kind between them, and she had no reason at that time to feel there was any ill feeling upon the part of either toward the other; that they stayed about ten minutes; that Clark was playing with defendant; that he "got her leg between his legs," and defendant pulled loose and "went on to the back door to go out from the kitchen to the hall," and said, " 'I believe I will go up the street' "; that Clark said " 'Well, I am going up the street,' " and defendant replied " 'I won't go then,' " and Clark said, " 'You don't have to—— Just going up the street because I am going—— you don't have to speak to me' "; that they went outside and closed the door; that they had been gone about fifteen minutes when she heard a shot; that Peters knocked on her door, said "something" to her, and she ran into the street, called a police officer, and did not return until after Clark had been taken to the hospital.

Peters testified: that he lived in the hotel; that he was in the manager's apartment when defendant arrived on the night of the homicide; that defendant, after asking for the knife, said, " 'Well, if you don't want to give me the knife, lend me the knife' "; that Clark was laughing while he was sitting on the stairway steps, and defendant was "walking up and around—— walking around in the room"; that Clark "continued laughing and talking" after he came into the apartment; that he was "playing with her" when he "moved his leg and her leg caught in between his leg"; that while they were there, defendant "was not in no good humor"; that she talked like she was "angry about something"; that she did not laugh while she was in the apartment; that "she was not pleased"; that defendant said, " 'I am going out,' " and Clark said, " 'I am going out in the street too' "; that Clark said further, " 'I don't have to go your way because I am

going down too,' " and that Clark said this "laughing and joking"; that defendant did not reply. At the preliminary hearing the witness had testified that defendant replied, " 'Well, I won't go,' " and that Clark said, " 'Well you don't have to say that to me.' " Peters testified further: that about five or seven or eight minutes after they left he (the witness) started to the "restroom," which was on the same floor; that he leaned up against the wall in the hallway before going into the restroom; that he saw Clark and defendant standing in the doorway to the back porch; that the door was open, and they "had the door blocked, one on each side"; that he leaned against the wall seven or eight minutes, during which time defendant and Clark remained in the doorway; that he was about 42 feet from them; that they were talking, but were "mumbling low" and he could not hear what they were saying; that he then went into the restroom, and "just as soon" as he "got in there" he heard the shot; that he ran into the hall and heard Clark "holler, 'Oh, Lord have mercy' "; that defendant was "right by" Clark, about five feet away from him, "looking down on him"; that defendant was coming toward the witness with the gun in her hand, "her arm was out straight and the gun was cocked"; that Clark was on the floor of the porch, with his feet "hanging down the stairs," and "his two legs were in between the banister"; that he (the witness) "picked him up and brought him into the door"; that the door to Clark's room was open and he saw defendant walk into the room and bring out a pillow, which Peters (the witness) placed under Clark's head; that while he was leaning against the wall watching defendant and Clark, he did not notice whether the door to Clark's room was open or closed; that when defendant went into Clark's room, he saw a woman in bed and a man "sitting on the chair"; that defendant stooped low over Clark before she went into his room; that he did not see her pick anything up from where Clark was lying; and that she did not have anything except the gun when she went into Clark's room.

A special police officer testified that he had known Clark about five months; that "a few minutes after 9" on the night of the homicide, he (the witness) was standing in front of the Crystal Bar (which was across the street from the hotel), when the manager of the hotel told him to come to the hotel; that after he went to the scene of the homicide, he returned

to the street where he saw defendant who was about six yards from the hotel; that he and two police officers, who "were standing there" with him, approached her from the rear; that the witness "touched her" on the shoulder, and when she turned around he "got hold of her right arm," and took the gun, which was cocked, out of her hand; that defendant was walking when she was arrested; that he left her in the custody of the two police officers, and returned to the scene of the homicide; that he searched the vicinity, and found a penknife, with one blade open, on the third step of the back porch, about four or five feet from where Clark had been lying; that he saw no blood on the knife; that he saw no club or billy of any kind; and that the only means of departure from the porch was through the hallway of the hotel or up the stairway to the third floor.

A police officer testified that he arrived at the hotel about 9:45 p. m., where he found Clark lying on the back porch facing "toward the banisters, with his feet under the banisters"; that Clark was making sounds which indicated he was in severe pain; that "almost immediately" after the officer arrived he had a conversation with Clark; that he climbed over the banister to get on the step below the place where the stairway was blocked, in order to be in a position so that he could see Clark and hear all that he said. In testifying concerning the conversation between Clark and himself, the officer referred to a report which he said he had made from original notes that he had written soon after the conversation. Over the objection of defendant this conversation was received in evidence as a dying declaration. The officer testified concerning it as follows: "I asked this man that was laying on the back porch, 'What is your name?' He answered, 'Ceberlee Clark.' 'Will you give us a statement concerning the shooting and who shot you.' He answered, 'I feel like I am going to die and can't talk.' Q.—— 'You are seriously injured and we want to know who shot you,' and he answered, 'Zilla, that girl, shot me.' Q. 'Why,' and he answered, 'She wanted in my room and I would not let her in because I had another fellow and a woman in the room.' Q. 'Where did the shooting occur?' A. 'Right here on the porch.' Q. 'What did it start over?' A. 'I would not let her in and she pulled a knife on me. I took it away from her and she grabbed my gun and shot me.' Q. 'Who was the man

in your room?' A. 'Jimmy.' '' The officer testified further that he, another police officer and the defendant went to the hospital about midnight, and that he had another conversation with Clark in the presence of the other officer and defendant, which was in substance that he asked Clark if defendant was the woman who shot him and Clark answered, '' 'What does she say?' '' and defendant said, '' 'Yes, I shot him,' '' and then Clark said, '' 'Yes, she shot me' ''; that he asked Clark if he owned a billy club and he said he did but he had ''loaned it to a special officer a week before'', and that he did not have any other billy club. The officer testified that he (the officer) then had a conversation with Clark's doctor, after which he returned to Clark's room and, in the absence of the other officer and the defendant, had a third conversation with Clark. This conversation was also received in evidence, over the objection of defendant, as a dying declaration. The officer testified concerning it as follows: ''I stated to Clark, 'Clark, my name is McGarry of the Homicide Bureau of the Police Department. I am a police officer. You are a special officer. You are in a very serious condition and I would like to have you tell me all of the facts surrounding the shooting.' His answer, 'I will tell you but I have to talk slow, because I hurt awful bad. I want to get better; I have so much to live for but I feel like I will die.' I answered, 'Take your time and I will listen to you.' And he answered, 'I had another girl in the Crystal Bar who I had just met. I had gone back to Oklahoma and had been gone three weeks. Before that I lived with Zilla. I came back Monday and she had moved. I took the girl to my room, also a fellow named Jimmy Garland. I then went out onto Fifth Street and I met Zilla. She wanted to come to my room. She came upstairs with me and I told her she could not come in because I had another girl in the room. She said, ''I don't care, I will come in anyway.'' I asked her what she had and she said, ''I have got a knife.'' I took the knife away from her and she grabbed my gun from my holster. I backed away from her toward the rear porch. I said, ''Zilla, put that pistol down,'' and she said, ''I am going to shoot you.'' I thought she was—— then she pulled the trigger and that is all.' '' The officer testified that he questioned him further as follows: ''Q. Is this a true statement? A. 'It is.' Q. In giving this statement, do you realize that you are going to die? A. 'Yes'.''

The officer testified further: that he did not ask Clark whether he understood the rule regarding dying declarations; and that Clark "was not angry," and gave no indication of having any ill feeling toward defendant.

A guest of the hotel, who occupied room 7 which adjoined the back porch, testified that the pistol shot awakened him; that he "got up," turned on the light, went to the clothes closet, got his trousers and put them on, then "opened the door and peeped out"; that he saw Clark "laying there groaning" and defendant coming from the porch; that she passed his door with the pistol in her hand; that she was "holding it down" and he saw about four inches of the barrel of the pistol; and that he did not see anyone in the hallway except Clark and defendant.

Beatrice Terry, a witness called by defendant, testified: that she had known defendant since 1936, and had known Clark about two months; that on the Thursday preceding October 23d she had a conversation with Clark which she had related to the defendant; that on Saturday, October 23, 1943, she and defendant started to a cafe for dinner, and she saw Clark standing in front of the Marcus Cafe "where he was supposed to be working" (which cafe was diagonally across the street from the hotel); that he asked where they were going, and said to defendant, " 'I want to talk to you a minute' "; that she (the witness) walked up the street and waited for defendant; that later Clark and defendant joined her about a block up the street, and the three of them went into "a little bar there"; that she drank beer and Clark and defendant "were drinking a highball"; that she overheard Clark ask defendant "to go back to him," and defendant said, " 'No, she was not going to live with him any more, because she was expecting her daughter and she did not want to live with him any more because they were not married' "; that she (the witness) remained in that bar with them about twenty minutes; and that when she left they were still there.

Defendant testified that she was married, but separated from her husband; that she had a daughter about fourteen years of age; that when she moved in with Clark, she took her clothes, and cooking utensils; that she lived with him more than two months, until he went to Texas "to see about his child"; that he did not go to Oklahoma, but to Houston, Texas, and she "bought the ticket" for him with her money;

that he did not take all of his clothes with him; that he was gone about three weeks; that she received one letter from him while he was gone; that she had worked at a packing house and she was permitted "to have two knives"; that she "only had two" knives, and she lent one of them to the manager of the hotel while she was living there; that while Clark was gone she paid the rent for the room, and when she moved from the hotel she paid a week's rent in advance; that, before Clark went away, she had not intended to move from the hotel, but during his absence she received a letter "stating of trouble at home" and she was going to have to care for her child; that it forced her to live alone and she "could not live with a man" that she was not married to and care for her child; that on October 23, 1943, she went to the apartment of a friend, Beatrice Terry, who told her Clark had been at her (Beatrice's) apartment looking for and asking about defendant, and that he had told Beatrice he "did not see how it could be" that he and defendant would have to be apart; that Beatrice and defendant left the apartment to go to the Marcus Cafe, where defendant intended to eat dinner; that they saw Clark standing "right by the door" outside the Marcus Cafe; that Clark and defendant spoke to each other; that he went into the cafe with defendant (and Beatrice stayed outside) ; that they stayed in the cafe long enough to see "if everything was filled," and then walked out and went to the Crystal Cafe and Bar; that Beatrice was standing "between Marcus' place and the Crystal Bar," and joined them as they passed her; that the three of them went into the Crystal Bar; that she (the defendant) drank; that Clark "appeared to be somewhat knocked off his feet or surprised or something," and he told her and Beatrice "how lonesome it had been for him since he had been back" and defendant was not "at the apartment any more and it seemed a matter of impossibility for him to remain there and stay on his job" without her "being there"; that he had quit his job the night before the 23d; that he wanted her to "come home," and she told him he had been drinking; that she explained her "troubles to him," and that she had "to sacrifice" her life for her child; that "it would not be right to live with him unmarried to him and have to care for" her child; that he asked her why she "would not go to the room and meet friends and meet the landlady"; that she told him she would not go

to his room; that he told her the manager of the hotel had been asking about her and wanted to see her; that "after seeing that he had been drinking" she decided she "would go over just to please for a few minutes"; that while at the Crystal Bar he told her that a man and woman were in his room; that Beatrice stayed in the bar fifteen or twenty minutes, and she and Clark were there "around 45 minutes"; that they then went to the hotel, and she went into the manager's apartment; that "they were all surprised" to see her, and offered her "a seat," but she told them she "did not have very much time," and she "refused to sit"; that she told them she was going home and "would like to get" her knife that she "had loaned her [the manager]," and the manager asked her why she would "want to give it to her and take it back," and the defendant replied that she had not given it to her. Defendant testified further that she had an apartment where she would have to cook and care for her child and "would be needing the knife"; that she still had her other knife; that after she had been in the manager's apartment seven or eight minutes, Clark came in laughing and "they asked him what was he laughing about," and he said, " 'Zib was mad' "; and that she then told the manager that Clark had a woman in his room. She also testified: that she was not "mad"; that the manager told her if she wanted the knife she could " 'get it,' " and that she replied that she "had better not take it" then, because if she did they would say she wanted to fight "as he [Clark] had made the statement" she was mad; that she was tired and said she was "going out on the street"; that Clark said, " 'If you are going, I am going too' "; that she answered, " 'if you are going, I won't go,' " to which he replied, " 'Well, why, the two of us go then—— you would not have to say anything to me' "; that she went out of the apartment with the intention of going home, and "started to the restroom [which was toward the rear of the hallway between the manager's apartment and Clark's room] before going out the stairway"; that Clark followed and "grabbed her from the back" and said, " 'Zilla, come on here, I want you to go and let me explain something to you' "; that he said he wanted to talk to her; that he "kept pushing" her toward his room, and said, " 'I have got to tell you something, because it is not the way you think,' " to which she replied, " 'It is nothing that I think;

it is nothing to be thought of, a drunk man and a drunk woman in your apartment"; that he pushed her "clear down the hall" to his room, unlocked the door, and said, " 'Why don't you come in?' "; that she refused, and he called to the man in the room and she said, " 'Don't call him—— don't disturb him, because I am not going in"; that after he saw she did not intend to go in, he tried to force her in; that he pushed the door open and she "drew" a pocket knife which she had in her coat pocket; that she opened the blade of the knife; that she "went to open the blade of the knife" but Clark "grabbed" her right hand, in which she held the knife, and took the knife away from her; that she did not open the blade; that he grabbed the knife before she had a chance to open it; that Clark asked her what else she had and she told him she did not have anything else—— that she "did not have any business going around with a pocket full of weapons"; that he said she was "too willing for him to take the knife"; that he did not try to search her; that it seemed he said something to the effect that she had better let him search her; that he reached for her, and she tried to jump back, but he kept coming and "When he got close enough" to reach her, she "snatched the gun out of his holster"; that they were "in front" of the door to his room at the time and she "started going backwards down the hallway that led onto the back porch"; that then Clark "reached on his belt and pulled off a club or billy," put it over his hand, and said, " 'Stop, Zib, you can't get away, come back' "; that she said, "Don't come on me with that billy club, or whatever it is," and he said, " 'Zib, stop, you can't get away, you are too close on me to hurt me,' " and she answered that she was not "trying to hurt him," that she was trying to get "out of the place"; that she continued backing down the hall with the gun by her side and pointed down; that the door which "led out on the back porch" was closed; that she backed to the door, reached behind her and unfastened the door with her left hand (the door opened into the hallway), went "out on the porch" and closed the door between them; that he "snatched it open" and she "jumped back" as there was not room "to back two feet," and she "jumped into the railing and threw up the gun"; that she was against the banister at the east end of the porch, to the side of and about four feet from the door; that Clark "stepped out of the door" and "had the billy up in

his hand all of the time," and could have struck her if he had "gotten close enough"; that she asked him not to come any closer; that he stepped "out of the door" which prevented her from going up the stairway (to the third floor), and she fired the shot; that she fired to keep him from "coming any closer," but she did not intend to shoot Clark; that she did not remember pulling the trigger; that she did not "know whether the gun shot" when she raised her hand "from hitting into the banister or whether it was coming down"; that she was very excited at the time; that she had had nothing to eat since morning; that after she fired, Clark said, " 'Look out, Zib,' and grabbed himself"; that she "helped him to lay down," and said, "what in the world is it?"; that he said, " 'I am hurt, Zib, call the doctor, call an ambulance and do that quick,' " and he asked her to "hold up his head"; that when Peters came, she went into Clark's room and got a pillow; that, in the room, she saw a man in a chair and a woman in the bed, and defendant said, " 'Wake up, because I have had an accident out here on the back porch with "Judge" [Clark] and, if the officers come and catch you, why they will take you and put you in jail' "; that she had removed the billy from Clark's hand, and had taken it and his hat into his room and put them on the wash basin at the time she went in for the pillow; that she returned with the pillow, and placed it under Clark's head; that she told him she was sorry and he told her "he knew" she did not mean to shoot him, but to get help right away, "because he was hurt and hurt bad," and wanted her to get Jack (referring to Jack Spears, a special officer); that she was going for Jack, who was at the Crystal Bar across the street from the hotel, when she was arrested; that she was present at one time when Officer McGarry was questioning Clark at the hospital; that Clark told McGarry the defendant " 'did not mean to shoot,' " him and that the officer asked Clark if he owned a "billy or blackjack or anything to that effect"; that Clark answered "yes," and said he had lent the club to someone; that the officer asked him if he owned "a blackjack or anything like that," and Clark replied, " 'I do' "; that the officer asked him if he thought he was "going to die," and Clark said, " 'No; I have got too much to live for' "; that he did not say he thought he was going to die. Defendant testified that the back door was closed all the time they were in

the hallway, and that they did not stand in the doorway at all. Defendant testified further that Clark had given her the key to his room on the night of the homicide. In response to a question as to when she received the key, she testified: ''That was during the tussle, you know—— it was not a tussle or anything—— it was during the time he was trying to persuade me to go across the street with him'' (to the hotel); that it ''was during the time that I promised him that I would go over and see the landlady and no further''; that she took the key to ''satisfy'' Clark, to ''stop argument there on the street''; that she did not intend to go to his room; that after they entered the hotel she went toward Clark's room, then she stopped, returned Clark's key to him and told him she ''was not going into the room''; that she told him she ''would not take his key,'' and for him to ''unlock his own door''; that she ''turned around, with him trying to catch'' her; that he had assisted her across the street by the arm, ''and on up the stairs,'' and still had hold of her arm when she gave him the key, but she ''pulled away'' from him and went back to the manager's apartment.

A physician, who performed the autopsy, testified that a chemical analysis of the blood for alcohol was negative.

Counsel for defendant contends that two statements made by Clark to the officer, purporting to be dying declarations, were hearsay and not dying declarations, and that the court erred in receiving those statements in evidence. His argument in support of that contention is that the statements were not made under a sense of impending death, since Clark said as a part of his last statement to the officer: '' 'I want to get better; I have so much to live for. . . .'' He asserts that said quoted portion of the statement shows that the deceased had a slight hope of recovery, and therefore the statements were not dying declarations. Counsel for defendant omitted to quote a very material part of the statement which followed immediately the portion of the statement quoted by him. The complete sentence, from which counsel quoted a part, was as follows: '' 'I want to get better; I have so much to live for but I feel like I will die.' '' Furthermore, in the last statement to the officer, near the end thereof, the officer said to Clark: '' 'In giving this statement, do you realize that you are going to die?' '' and Clark said, in reply thereto: '' 'Yes.' '' In the first statement the officer said: '' 'Will

you give us a statement concerning the shooting and who shot you?' " and Clark said, in reply thereto: " 'I feel like I am going to die and can't talk.' " The first statement was made at the hotel about 10 p. m., and the second statement was made at the hospital soon after midnight. Clark died on October 24th. ■ In determining whether the statements of deceased should be received in evidence as dying declarations the trial court had the right to consider decedent's physical condition, the nature of his wounds, his knowledge of his serious condition, his conduct, and his statements. (*People* v. *Wilson* (1942), 54 Cal.App.2d 434, 441 [129 P.2d 149].)

■ It is within the province of the trial court to determine the sufficiency of the foundation proof which will entitle an alleged dying declaration to be admitted in evidence. (*Ibid.*)

■ The trial court did not err in admitting said statements in evidence as dying declarations.

■ Defendant contends further that the court erred in giving an instruction concerning involuntary manslaughter. The court instructed the jury as follows: "Manslaughter is the unlawful killing of a human being without malice. It is of two kinds: 1. Voluntary—upon a sudden quarrel or heat of passion. 2. Involuntary—in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death in an unlawful manner, or without due caution and circumspection." Defendant asserts that the portion of the instruction relating to involuntary manslaughter should not have been given for the reason that "when a person commits a homicide in necessary self-defense, he is not bound to use any due caution and circumspection when protecting himself." That reason, so assigned by defendant, is based upon the assumption that at the time the instructions were given it was known that defendant acted in self-defense. It was a question of fact for the jury as to whether defendant acted in self-defense. At the time the instructions were given, the jury, of course, had not determined whether the defense of self-defense had been proved. The court was required to give instructions which were applicable, not only to the charge expressly alleged but to the offenses included therein, upon the theory that self-defense might be proved and upon the theory that it might not be proved. The court should have given the instruction concerning involuntary manslaughter unless it could have been determined as a

matter of law that involuntary manslaughter was not involved. One of the defenses upon which defendant relied was that she did not intend to shoot Clark, that she was holding the gun by her side, pointing it downward, as she was backing away from Clark and trying to get out of the hotel, and that he was advancing toward her and the gun was discharged accidentally when she backed against the railing of the back porch. By reason of the evidence as to that alleged defense, and by reason of the evidence as to the alleged scuffles in the hallway, which might have been found to be "an unlawful act not amounting to a felony,". such as assault or battery, it cannot be determined as a matter of law that involuntary manslaughter was not involved. It was proper to give the instruction concerning involuntary manslaughter. In making the contention last above mentioned, defendant relies upon the case of *People* v. *Hatchett* (1944), 63 Cal.App.2d 144 [146 P.2d 469], and particularly upon the statements on page 161 to the effect that an instruction concerning involuntary manslaughter should not have been given therein. That case is distinguishable from the present case, insofar as the giving of instructions on involuntary manslaughter is concerned, in that there was no evidence therein to the effect that the shooting occurred accidentally or unintentionally, or that there was any scuffling from which it might have been found that an unlawful act not amounting to a felony was committed. Another respect in which that case is distinguishable from the present case is that the charge therein was manslaughter, and not murder. In that case the defendant could not have been convicted of a higher crime than manslaughter, and as a matter of law involuntary manslaughter was not involved, and 'it was held therein, among other things, that the giving of instructions which were a "part of the differentiation of murder from manslaughter" and which defined involuntary manslaughter, tended to confuse the jury and should not have been given. In the present case, since the defendant was charged with murder which included the lesser offense of manslaughter, and since as a matter of law involuntary manslaughter was involved herein, it was proper to give instructions differentiating murder from manslaughter, and to give the instruction concerning involuntary manslaughter.

Defendant asserts further that the giving of the instruction concerning involuntary manslaughter prevented the jury from

finding the defendant guilty of manslaughter, since the jury might have found that she did not use due caution and circumspection in committing the "lawful act" of protecting herself and therefore, under that instruction, she could not have been found guilty of involuntary manslaughter. This contention is made in the brief but without explanation as to how the instruction could have prevented a verdict of manslaughter. Upon the contrary, the instruction was favorable to defendant, for the reason that the jury might have accepted a version of the shooting which would have resulted in a conviction of manslaughter instead of murder. It appears to be contended also that the instruction on involuntary manslaughter in some manner deprived defendant of her claim of self-defense. The argument is without merit. As already pointed out, the instruction on involuntary manslaughter was not only proper in view of the evidence, but it was to defendant's advantage that it be given. The jury was fully and correctly instructed as to the law of self-defense. There might have been merit in the argument if there had been no theory of the evidence under which defendant could have been convicted of manslaughter and she had nevertheless been convicted of that offense. The jury rejected the claim of self-defense by returning a verdict of murder. The jury having concluded that the defendant did not act in self-defense, it cannot be asserted accurately that the instruction concerning involuntary manslaughter prevented the jury from finding the defendant guilty of manslaughter. ■ Furthermore, even if it had been error to give the instruction concerning involuntary manslaughter, the giving of such instruction was not prejudicial. The defendant was charged with murder and was found guilty thereof, and it is not asserted that the instructions as to murder were erroneous. In *People* v. *Boggs* (1938), 12 Cal.2d 27, at page 33 [82 P.2d 368], the court said: "Defendant first challenges part of instruction number 34 having to do with manslaughter. The language complained of is but part of a long instruction wherein the court, for the guidance of the jury, repeated substantially *verbatim* the provisions of sections 187, 189 and 192 of the Penal Code wherein are defined the offenses of murder of the first and second degree and manslaughter. The latter portion of the instruction, even if inaccurate, could not have prejudiced the defendant. Particularly is this so, in view of the jury's verdict

finding him guilty of murder of the first degree. [Citing cases.] In other words, judging from its verdict, the jury was satisfied beyond a reasonable doubt that the prosecution had established the essentials of murder of the first degree, which essentials were correctly set forth in the instructions.''

■ The defendant contends further that the court erred in refusing to give the following instruction: ''You [are] instructed that if the appearances are such as to justify [a] killing in self-defense, the Defendant is not required to exercise any due caution [care] or circumspection in the killing.'' The clerk's transcript and original file show that counsel for defendant has not quoted the refused instruction correctly in his brief. That instruction had the word ''care'' therein in place of the word ''caution,'' and the word ''are'' and the article ''a'' should have been included therein as indicated above by brackets. The instruction concerning involuntary manslaughter having been given, that instruction which was refused should have been given. The failure to give it, however, was not prejudicial. The jury found impliedly that defendant did not act in self-defense, and, of course, the proposed instruction concerning due caution or circumspection in committing the lawful act of self-defense was not applicable in view of that finding.

■ Another contention of defendant is that the evidence was insufficient to support a conviction of murder of the first degree. Counsel for defendant asserts that, assuming that the jury rejected defendant's version of the shooting, ''the verdict should have been no more than second degree murder.'' He relies upon the principle of law stated in *People* v. *Wells* (1938), 10 Cal.2d 610, at page 616 that [76 P.2d 493] : ''When the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree, and not murder of the first degree.'' In that case it was stated further, on page 617 : ''In each of the authorities to which reference hereinbefore has been had, it may be noted that the declaration by the court to the effect that in the circumstances therein assumed to exist, the crime would amount to second degree murder only, is dependent upon the fact that an unlawful killing and *'nothing further'* has been shown. In the instant case, much more than the isolated fact

that Price was unlawfully killed by defendant was thoroughly established; and considering the law, together with the evidence that hereinbefore has been summarized, it would seem clear that the conclusion of express malice of defendant was fairly deducible.'' In the present case there was more than the isolated fact of an unlawful killing. The evidence herein was sufficient to prove that Clark was jovial, had not been drinking alcoholic liquor, and did not assault or threaten defendant; that defendant knew that Clark, with whom she had lived, had another woman in his room; that she was angry; that she tried to obtain a butcher knife from the hotel manager a few minutes before she took the pocket knife out of her pocket; that she tried to or did open the pocket knife; that immediately after she was disarmed, that is after the knife was taken from her, she snatched the pistol from the holster; that Clark told her to put the pistol down; that she said she was going to shoot him; that they were just a few feet apart; and that she shot him two inches below the heart. These facts were sufficient to prove that the killing was premeditated. ▮ It is not a legal requirement that premeditation, sufficient to constitute the element of premeditation in murder of the first degree, should exist for any given length of time, or for an appreciable time. (*People* v. *Wells* (1938), 10 Cal.2d 610, 619 [76 P.2d 493].) Such premeditation may be instantaneous. (*People* v. *Holt* (1944), 25 Cal.2d 59, 84 [153 P.2d 21]; *People* v. *Aranda* (1938), 12 Cal.2d 307, 310 [83 P.2d 928].) ▮ It was a question of fact for the jury as to whether there was premeditation. '' [T]he existence of a deliberate purpose to kill may be inferred from the character of the weapon used, the circumstances surrounding and showing the relationship of the parties, and the acts and conduct of the accused.'' (*People* v. *Holt, supra,* p. 84.) The jury had the benefit of personal observation of the witnesses. ▮ The defendant made inconsistent statements concerning material issues, particularly as to whether she opened the knife, and as to whether she fired the gun in self-defense or fired it accidentally. Her testimony that deceased had a billy and that she took it into his room after the shooting was not corroborated and there was testimony that no club was found in the room or elsewhere. The jury found that she gave false testimony. Although no one saw the shooting other than Clark and defendant, there was a witness who saw the

happenings in the hallway and in the rear door up to a time within a few seconds of the shooting. The evidence was legally sufficient to support the verdict.

The judgment and sentence, and the order denying defendant's motion for a new trial, are affirmed. The appeal from the verdict is dismissed.

Desmond, P. J., and Shinn, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 15, 1945, and the following opinion was thereupon rendered:

THE COURT.—We expressly withhold approval of the following statement in the foregoing opinion: "It is not a legal requirement that premeditation, sufficient to constitute the element of premeditation in murder of the first degree, should exist for any given length of time, or for an appreciable time. [Citation.] Such premeditation may be instantaneous. [Citations.]"

The petition for hearing is denied.