Filed 11/20/24  P. v. King CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D083318 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 16CR-019582) |
| MAURICE RICHARD KING, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino, Alexander R. Martinez, Judge.  Affirmed.

Rachel Varnell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Joshua Trinh, Deputy Attorneys General, for Plaintiff and Respondent.

Maurice Richard King shot his close friend and lived with the dead body for a week.  The San Bernardino County District Attorney charged King

with murder (Pen. Code,[1] § 187, subd. (a); count 1) and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2), in addition to alleging several firearm enhancements to count 1 and prior convictions.

A jury found King not guilty of first degree murder but deadlocked on the lesser offenses of the murder charge. They found him guilty of count 2. The court declared a mistrial on count 1, and King waived sentencing on count 2 until after a trial on the lesser included offenses of count 1 and the priors.

By a second amended information, King was charged with one count of second degree murder (§ 187, subd. (a); count 1). As to count 1, the information alleged that King personally and intentionally discharged a firearm, causing great bodily injury and death (§ 12022.53, subd. (d)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), personally used a firearm (§ 12022.53, subd. (b)), and personally used a handgun (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a)). The information also alleged that King had suffered a prior strike conviction (§§ 1170.12, subds. (a)−(d)/667, subds. (b)−(i)) and a prior serious felony (§ 667, subd. (a)(1)), and that there were nine potentially applicable aggravating factors.

A second jury found King guilty of second degree murder and found true all the firearm enhancements. Following a bifurcated bench trial, the court found the prior strike and prior serious felony convictions to be true.

In August 2023, the trial court sentenced King to a total term of 55 years to life in prison. This sentence consisted of 15 years to life for count 1, doubled to 30 years, plus 25 years to life for the Penal Code

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

2

section 12022.53, subdivision (d) enhancement.[2] The trial court also imposed a $1,000 restitution fine (§ 1202.4, subd. (b)), a $40 court security fee (§ 1465.8), a $30 criminal conviction assessment (Gov. Code, § 70373),[3] a stayed $1,000 restitution fine (§ 1202.45), and $3,425 in victim restitution (§ 1202.4, subd. (f)).

On appeal, King argues the trial court prejudicially erred in providing a legally inaccurate clarifying instruction on the definition of provocation in response to a jury question. He also contends the court abused its discretion in imposing a $1,000 restitution fine. Alternatively, he asserts he was denied effective assistance of counsel because of counsel's failure to request that the restitution fine be stayed and the assessments be stricken.

We disagree and affirm the judgment.

FACTUAL BACKGROUND

Kenneth H. moved in with King, his close friend, in around April 2016. Kenneth's son, N.H., had known King nearly since his birth, called him "Unc" for uncle, and said his father and King were "like brothers."

N.H. last spoke to Kenneth on May 6, 2016. On May 13, 2016, N.H.'s sister, R.H., called him to express concern that Kenneth had not called her on Mother's Day. N.H. immediately telephoned King and asked where his father was. King responded, "I just told your sister he is in Los Angeles with some girl. I'm going to pick him up later." N.H. relayed this to his sister,

_____

[2]    The court also imposed, but stayed, a term of two years, doubled to four years for the prior strike conviction and an additional term for the remaining enhancements.

[3]    We will refer to the court security fee and the criminal conviction assessment collectively as the "assessments."

who decided to file a missing person's report because she said, "[s]omething is not right. He would call me on Mother's Day."

That evening, N.H. accompanied the police officer who responded to R.H.'s report to King's home. The house was dark, and no one responded when the officer knocked on the door, so the officer suggested they try again the next day.

After calling his father several times with no response, N.H. returned to the home the next morning. He found King sitting in front of the house with his head down. King again told him his father was in Los Angeles and that he planned to pick him up that night. He asked N.H., "Nephew, can you give me a ride? They left me." N.H. called R.H., who called the police. N.H. then returned to his own home.

A police officer arrived at the house and found King standing in the driveway holding a trash bin. King told him he was going to a friend's house and that no one was in his home, but the officer described King as appearing nervous. The officer walked to the front door of the residence, at which point he noticed the smell of body decomposition coming from the back of the house. The smell worsened as he approached, and he saw that flies covered the slider door at the rear of the home. Through the slightly ajar slider door, he observed a trash bin containing a human body wrapped in bed sheets. The body was covered in maggots. The officer immediately called for backup.

Kenneth had gunshot wounds in his face and neck. The forensic pathologist listed the cause of death as gunshot wounds of the head and neck and classified it as a homicide. A crime scene technician found three bullet cartridge casings inside a beer can. In the living room, she observed blood-stained carpeting that appeared to have been bleached and which contained

4

maggots. There was a bullet hole in the wall behind the couch and one in the couch.

A detective interviewed King on May 14 and again on May 16. Recordings of both interviews were played for the jury. King explained that he had just had hip surgery and had been prescribed oxycodone. He had been using a walker, and a neighbor named D.R. was taking care of him while he recovered.

King provided several explanations of what occurred that evening before confessing to killing Kenneth. He explained that, a week prior, Kenneth had come home from the hospital and started an argument with him. He said Kenneth was angry because King had called "Nae" and told her Kenneth had been stealing things from R.H. Kenneth, who was seated on the couch, started "talkin' shit" and called King "a crippled mother fucker." King got "pissed off" and used his walker to walk back to his bedroom, where he retrieved a gun from his nightstand. He put it in his shorts pocket and returned to the living room using his walker. From the hallway, he shot at Kenneth three times. The first bullet went into the wall over the couch, and the next two hit Kenneth.

D.R. heard the argument, came out from the bedroom, saw Kenneth dead, and went back to bed. The next day, D.R. put his body in a trash can. She and another man attempted to use a car jack to jack up the trash can and drag it outside but were unsuccessful. King put the shell casings in a beer can and said D.R. disposed of the gun. At some point, King called his son, told him he had killed Kenneth, and asked him to come help him get up. His son never came.

5

DISCUSSION

I.

The Court's Instruction on Provocation

King contends that, in response to the jury's request for a definition of provocation, the trial court provided a legally inaccurate instruction on voluntary manslaughter that violated his Fifth Amendment right to due process and Sixth Amendment right to a jury trial. The People respond that the clarifying instruction was proper and that, in any event, any error was harmless.

We conclude King has not demonstrated prejudice warranting reversal.

A. *Additional Facts*

As to count 1, second degree murder, the court instructed the jury on homicide (CALCRIM No. 500), lawful self-defense (CALCRIM No. 505), express and implied malice (CALCRIM No. 520), and imperfect self-defense (CALCRIM No. 571). It further explained that provocation may reduce murder to manslaughter. (CALCRIM Nos. 522 & 570.) In particular, it instructed with CALCRIM No. 570, which provides, in part:

> "Voluntary manslaughter is a lesser included offense to murder.

> "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

> "The defendant killed someone because of a sudden quarrel or in the heat of passion if:

> "1. The defendant was provoked;

> "2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;

> "AND

6

"3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection."

During deliberations, the jury sent a note that said, "Define Provocation (definition)." The court summoned counsel to discuss the note and provided them with the court's proposed response, which read:

"Provocation is discussed in Instructions 522 and 570. Please re-read those instructions.

"To reduce a murder to manslaughter, provocation must be the type of provocation that the jury believes would cause a reasonable person of average disposition to act in the way that the Defendant acted in this case.

"The law states that a Defendant does not get to personally decide for himself if he was adequately provoked, and a Defendant does not get to personally decide what is the appropriate response to that provocation.

"It is up to YOU, the jury, to decide:

"(1)    Whether the Defendant was provoked at all;

"AND

"(2)    Whether you believe that the provocation, if any, was sufficient to cause a reasonable person of average disposition, to act in the way that the Defendant acted in this case.

"You the jury decide what a reasonable person would do."

King's counsel agreed the first two lines were appropriate but otherwise objected to the court deviating from the standard instruction language. The court decided to give the clarifying instruction, over counsel's objection, because it comported with the court's view that CALCRIM No. 570 "talk[s]

7

about reasonableness versus a subjective defendant, a personal standard, which [CALCRIM No.] 570 states isn't enough for the reduction down to manslaughter."

B. *Legal Principles*

"An appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury." (*People v. Waidla* (2000) 22 Cal.4th 690, 745–746.) However, if the court offers an instruction, we review de novo any claim of instructional error. (See *People v. Mitchell* (2019) 7 Cal.5th 561, 579.) "In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution." (*Ibid.*)

C. *Analysis*

King contends the court erred by focusing on his specific actions when it instructed the jury it had to determine whether "the provocation, if any, was sufficient to cause a reasonable person of average disposition, to act *in the way that the Defendant acted in this case*" (italics added), instead of whether "[t]he provocation would have caused a person of average disposition *to act rashly and without due deliberation, that is, from passion rather than from judgment*" (italics added). Although the court also properly instructed the jury using CALCRIM No. 570, the People acknowledge that, considered in isolation, the court's language "act in the way that the Defendant acted in this case" resulted in ambiguity as to whether the court was referring to the fact that King killed someone or acted rashly.

To the extent the language could be read as requiring that the provocation would cause a reasonable person to kill, it is problematic. In

8

*People v. Beltran* (2013) 56 Cal.4th 935 (*Beltran*), the court addressed the government's argument that "the proper standard for assessing the adequacy of provocation is whether an ordinary person of average disposition would be moved to kill." (*Id.* at p. 946.) Our high court concluded this was not the appropriate measure, explaining that "Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, not on his particular act." (*Id.* at p. 949.) Specifically, "[t]o be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react,* without reflection" and in such a way that "the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene." (*Ibid.*)

Because the court's instruction here focused on "the way that the Defendant acted" versus the way he reacted, we agree it is not entirely clear this response to the jury's question was legally sound. Further, because the way King "acted" was to kill Kenneth, the instruction is more concerning. The *Beltran* court specifically concluded that "provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*Beltran, supra*, 56 Cal.4th at p. 949.)

Assuming the court thus erred, we may not reverse unless the error was prejudicial. The People urge us to apply the state law harmless error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836, which provides that an error is harmless unless the defendant shows that it is reasonably probable a more favorable result would have been obtained absent the error. However, jury instructions that "provide an incomplete or

9

misleading description of what is necessary to establish an element of the offense" are subject to harmless error review under the more stringent federal standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Schuller* (2023) 15 Cal.5th 237, 257, 260, fn. 7 (*Schuller*) [holding that this standard applies to all forms of voluntary manslaughter because they negate the malice element of murder]; *People v. Wilkins* (2013) 56 Cal.4th 333, 350.) " ' "[L]egal error requires a more stringent standard for prejudice . . . [because] jurors are presumed to be less able to identify and ignore an incorrect statement of law due to their lack of formal legal training. [Citation.] Factual errors, on the other hand, are less likely to be prejudicial because jurors are generally able to evaluate the facts of a case and ignore factually inapplicable theories." ' " (*People v. Mumin* (2023) 15 Cal.5th 176, 207.) Under the *Chapman* standard, reversal is not required "if the misdescription was harmless beyond a reasonable doubt." (*People v. Hagen* (1998) 19 Cal.4th 652, 670.)

The fact that this case is somewhat akin to those involving alternative-theory errors, which also rise to the level of federal constitutional errors (see *In re Lopez* (2023) 14 Cal.5th 562, 580), supports our conclusion. In such cases, the jury is instructed on alternate theories of liability, one which is legally valid and another that is legally invalid. (*Id.* at p. 580.) For example, in *Lopez*, "the trial court properly instructed the jury that it could find Lopez guilty of first degree murder as a direct aider and abettor or as the actual perpetrator of the first degree murder" but also improperly instructed it with the no longer legally viable principle "that it could find Lopez guilty of first degree murder based on the theory of natural and probable consequences." (*Id.* at p. 579.) Similarly, although the court appropriately instructed the jurors on provocation in this case and directed them in its response to their

10

question to re-read "Instructions 522 and 570," it also provided a misleading, and likely legally unsound, description of what was necessary to establish provocation (and thus, the absence of the malice element of murder). Given that the error at the very least is misleading as to an element of the offense, we find it appropriate to apply the more stringent harmless error standard.[4]

The *Chapman* standard, "compels the reviewing court to reverse the conviction unless it concludes that no 'rational juror who made the findings reflected in the verdict and heard the evidence at trial could have had reasonable doubt regarding the findings necessary to convict the defendant [absent the instructional error].' " (*Schuller, supra,* 15 Cal.5th at p. 244.) Stated differently in the context of alternative-theory error, "The reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 13.) In other words, "our task in analyzing the prejudice from the instructional error is whether any rational fact finder could have come to the *opposite* conclusion" of that found by the jury. (*People v. Mil* (2012) 53 Cal.4th 400, 418 (*Mil*).) "If, at the end of that

---

4  The same logic applies to the two other shortcomings King perceives with the court's response to the jury's question. King objects that, in changing the required finding from "The defendant was provoked" to "Whether the Defendant was provoked at all," the court implied it did not believe King had been provoked, there was little evidence he had been provoked, or that this was a more difficult standard to meet than the fact that King was merely provoked. King also objected that the court's response to the jury question omitted the requirement that the jury find that King did actually act "rashly and under the influence of intense emotion that obscured his reasoning or judgment" as required by CALCRIM No. 570. Both of these perceived errors could be construed as involving a misstatement of or omission from CALCRIM No. 570 and, thus, support applying the *Chapman* standard of review.

11

examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless." (*Neder v. United States* (1999) 527 U.S. 1, 19; *Mil*, at p. 417.)

In this case, it is undisputed King contested the element of malice, arguing that he was provoked and acted rashly. However, King did not raise evidence sufficient to support a contrary finding—in this case, a finding that he lacked malice because he killed Kenneth due to a sudden quarrel or in a heat of passion. Although the jury's question suggests this jury may have been considering whether King was provoked, our review of the record indicates it does not contain legally sufficient evidence of provocation.

The alleged provocation here was Kenneth calling King a "crippled mother fucker" and "talkin' shit" to him while sitting on the couch. Our Supreme Court has repeatedly made clear that, although provocative conduct may be verbal, "such provocation 'must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment.' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 585–586; *People v. Lee* (1999) 20 Cal.4th 47, 60.) In *Manriquez*, the court found this standard was not met where the victim "called defendant a 'mother fucker' " and "taunted [the] defendant, repeatedly asserting that if defendant had a weapon, he should take it out and use it." (*Manriquez*, at pp. 585−586.) Likewise, the court found insufficient evidence to justify a voluntary manslaughter instruction where the evidence of provocation was that the defendant's girlfriend told him "she would put a 'butcher knife in [his] ass.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1216; see also *People v. Gutierrez* (2009) 45 Cal.4th 789, 826–827 [verbal argument where the defendant told the victim to " '[g]et off

me, you f...ing bitch,' " and "she 'cuss[ed] back at' him" did not constitute sufficient provocation for voluntary manslaughter].)  Our colleagues in Division Three of the Fourth Appellate District similarly held in *People v. Najera* (2006) 138 Cal.App.4th 212, that calling the defendant a homophobic slur and pushing him to the ground did not constitute legally sufficient provocation.  (*Id.* at p. 226 & fn. 2 citing *People v. Wells* (1938) 10 Cal.2d 610, 623 [" 'A provocation of slight and trifling character, such as words of reproach, however grievous they may be, or gestures, or an assault, or even a blow, is not recognized as sufficient to arouse, in a reasonable man, such passion as reduces an unlawful killing with a deadly weapon to manslaughter' "].)  Under this precedent, we conclude Kenneth's words and actions were insufficient to constitute provocation as a matter of law.  Thus, no rational fact finder could have reached the conclusion that King killed Kenneth in a heat of passion.  (*Mil*, *supra*, 53 Cal.4th at p. 418.)

## II.

## $1,000 Restitution Fine

King contends the trial court abused its discretion in imposing a $1,000 state restitution fine, instead of staying it, because the record showed King lacked the ability to pay the fine.  Alternatively, he argues he was denied effective assistance of counsel because counsel failed to object to the imposition of the fine and assessments.

The People counter that King forfeited his challenge to the restitution fine and assessments by failing to object or request a hearing on King's ability to pay.  We agree King forfeited the claim and conclude counsel was not ineffective.

13

A. *Additional Facts*

At the sentencing hearing, defense counsel requested that the court "set the restitution fine at the statutory minimum of $300 so that the bulk of any restitution fines that are collected from Mr. King while he is incarcerated would go directly to the family reimbursing the Victim Compensation Bored [*sic*]." The court did not address this request. Instead, it imposed a restitution fine of $1,000 pursuant to section 1202.4, in addition to the assessments and other fines. Defense counsel did not object to any of these fines or assessments.

B. *Legal Principles*

"In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record." (§ 1202.4, subd. (b).) "A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine." (*Id.*, subd. (c).) For a felony conviction, the court has discretion to set the fine anywhere between $300 and $10,000, but the fine must be "commensurate with the seriousness of the offense." (*Id.*, subd. (b)(1).) In setting the fine above the minimum, the court need not make express findings, but "shall consider any relevant factors, including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime." (*Id.*, subd. (d).) "A defendant shall bear the burden of demonstrating the defendant's inability to pay." (*Ibid.*)

14

C. *Forfeiture*

" 'Given that the defendant is in the best position to know whether he has the ability to pay, it is incumbent on him to object to the fine and demonstrate why it should not be imposed.' " (*People v. Lowery* (2020) 43 Cal.App.5th 1046, 1053.) Although King asked for the minimum fine, he did not base his request on his inability to pay. He also did not provide evidence demonstrating that he could not pay the fine or assessments or object when the court imposed the $1,000 fine. Finally, he did not request a hearing regarding his ability to pay. Thus, we conclude he forfeited the issue. (See *People v. Avila* (2009) 46 Cal.4th 680, 729; *Lowery*, at p. 1054.)

Furthermore, King bases his argument that the court was required to stay the restitution fine on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, which held that "the execution of any restitution fine imposed under [section 1202.4] must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Id.* at p. 1164.) Because *Dueñas* was decided before King's sentencing hearing, counsel could have brought the case to the court's attention. Counsel did not. Thus, there is no basis for excusing his forfeiture. (C.f., *People v. Belloso* (2019) 42 Cal.App.5th 647, 662, review granted March 11, 2020, S259755[5] [declining to find forfeiture where *Dueñas* had not yet been decided at the time of the defendant's sentencing because " 'defendant's challenge on direct appeal is based on a

---

[5] The California Supreme Court deferred further action in the Belloso case pending consideration and disposition in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844 (*Kopp*). The court granted review of our decision in *Kopp*, discussed *post*, to address whether a trial court must "consider a defendant's ability to pay before imposing or executing fines, fees, and assessments," and, "[i]f so, which party bears the burden of proof regarding defendant's ability to pay."

newly announced constitutional principle that could not reasonably have been anticipated at the time of trial' "].)

D. *Ineffective Assistance of Counsel*

In anticipation of a finding of forfeiture, King argues he received ineffective assistance of counsel because his trial attorney did not object to the imposition of fines and assessments. To establish ineffective assistance of counsel, a "[d]efendant must show that counsel's performance was both deficient and prejudicial, i.e., that it is reasonably probable that counsel's unprofessional errors affected the outcome." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1014–1015, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687, 693–694.) "[I]f the record sheds no light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for an explanation and failed to provide one, or there could be no satisfactory explanation for counsel's performance." (*Castillo*, at p. 1015.)

We are not persuaded that defense counsel's performance was deficient in this case. Because the court set the restitution fine above the statutory minimum of $300, we may infer that the court *did* consider King's ability to pay. (§ 1202.4, subd. (d) [the court "shall consider any relevant factors, including, but not limited to, the defendant's inability to pay . . . ."].) Therefore, even if counsel had brought *Dueñas* to the court's attention, there would have been no reason for the court to stay execution of the fine because *Dueñas* only required a stay *until* the trial court held an ability to pay hearing. (See *Dueñas, supra*, 30 Cal.App.5th at p. 1164.) In other words, because the court already was required to consider King's ability to pay at that sentencing hearing, no future hearing would be required.

16

It also is not clear from the record that King could not pay the fine and assessments. " '[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165 (*Johnsen*).)  Here, the probation report recommended a fine of $10,000, yet counsel did not raise the issue of his inability to pay.  Instead, counsel asked that the fine be set at the statutory minimum of $300 only because he wished that "the bulk of any restitution fines that are collected from Mr. King while he is incarcerated would go directly to the family. . . ."  The inference from both of these facts, coupled with counsel's failure to object after the court set the fines and assessments at only $1,070, is that King could pay them.[6]

The ability to pay also was only one of many factors relevant to the court's analysis under section 1202.4, subdivision (d).  In complying with its duty to consider "the seriousness and gravity of the offense and the circumstances of its commission" (§ 1202.4, subd. (d)), the court also should

---

[6]     King does not draw a distinction between the restitution fee and the court assessments.  As we previously explained in *Kopp*, assessments, unlike restitution fines, are not punitive in nature. (*Kopp*, *supra*, 38 Cal.App.5th at p. 95.)  Accordingly, we agreed with *Dueñas* that it was unfair and served no rational purpose to impose unpayable assessments on indigent defendants. (*Ibid*.)  Here, as with his challenge to the fine, King forfeited the issue of inability to pay the assessments by not raising it below.  Furthermore, neither King nor the record discloses any reason that the grounds for believing he could pay the $1,000 fine, discussed *ante*, do not also apply to the $70 in assessments.  Thus, there appears to be a "conceivable reason" (*Johnsen*, *supra*, 10 Cal.5th at p. 1165) for counsel not objecting to the assessments and, thus, King has not overcome the presumption that his attorney's conduct fell "within the wide range of reasonable professional assistance." (*Strickland*, *supra*, 466 U.S. at p. 689.)

17

have considered that King was convicted of murder, lived with the decomposing body for a week, enlisted help to try to cover up the crime, and lied to the victim's family. Given these facts, it is doubtful the court could have reduced the fine any further than from $10,000 to $1,000 without violating its duty to set the fine "commensurate with the seriousness of the offense" (§ 1202.4, subd. (b)(1)). Furthermore, "[t]he court was permitted to conclude that the monetary burden the restitution fine imposed on defendant was outweighed by other considerations," and the fine was not automatically rendered invalid even if King was unable to pay it. (*People v. Potts* (2019) 6 Cal.5th 1012, 1056–1057 & fn. 13 [concluding under the circumstances that "the fine would not be excessive, deny defendant due process, or deny him equal protection of the laws"].) Thus, an objection asking the court to simply exercise its discretion differently, when the outcome was already favorable to King when compared to the probation department's recommendation, would likely have been futile.

King argues the record shows he was not able to pay because the lower court found him indigent for purposes of receiving trial transcripts, and because he received the assistance of appointed counsel at trial and on appeal. Although "public defender clients, all of whom have already been financially evaluated and found indigent by the court, are legally entitled to a presumption of indigence for most purposes . . . .[¶] . . . the Legislature has also recognized that a defendant's financial circumstances may change." (*People v. Rodriguez* (2019) 34 Cal.App.5th 641, 645.) For example, a court may consider the defendant's ability to pay fines and assessments from future prison wage earnings. (*People v. Johnson* (2019) 35 Cal.App.5th 134, 139−140 [finding alleged *Dueñas* error harmless beyond a reasonable doubt because defendant could pay fine and assessments from prison wages].)

18

King challenges this assumption, arguing it is not reasonable to assume he will procure a job in prison because the unemployment rate in California prisons is roughly 90 percent. Further, even if he found one, it might not pay enough to satisfy the debt. Essentially, King asks us to assume the worst outcome from each inference—from King's ability to pay to his ability to secure prison employment during his 55 year-to-life sentence— even though the opposite inference also may be true. Given the high court's instruction that "[j]udicial scrutiny of counsel's performance must be highly deferential" (*Strickland, supra,* 466 U.S. at pp. 688–689), we decline to infer the worst when the record supports inferences that counsel had grounds for not objecting. In other words, in light of all of the circumstances, we do not conclude "the identified acts or omissions were outside the wide range of professionally competent assistance." (*Id.* at p. 690.)

Furthermore, King has not met his burden of affirmatively proving he was prejudiced by his attorney's perceived error. (*Strickland, supra,* 466 U.S. at p. 693; *People v. Ledesma* (1987) 43 Cal.3d 171, 217.) "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test." (*Strickland,* at p. 693.) Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at 694.)

As we already noted, the court would not have had grounds to stay the fines because it had already held a hearing during which it impliedly determined King had the ability to pay. And, regardless of his basis for doing so, King did request the statutory minimum for the restitution fine. Given that the court then set the fine at only $1,000 despite the probation report's recommendation of a $10,000 fine and despite all the circumstances of the

19

offense that justified a higher fine, it is not reasonably probable the court would have set it lower had counsel objected based on inability to pay. The fact that it is conceivable the court would have imposed a lower fine and struck the assessments does not alone support a finding that counsel was ineffective. (*Strickland*, *supra*, 466 U.S. at p. 693.)

## DISPOSITION

The judgment is affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


O'ROURKE, J.


IRION, J.