Filed 12/12/25  P. v. Faulkner CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> ANTHONY MENDOZA FAULKNER, <br><br>     Defendant and Appellant. | B336045 <br><br> (Los Angeles County Super. Ct. No.BA495435) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Henry J. Hall, Judge.  Affirmed.

David Greifinger, under the appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney, Jason Tran and Megan Moine, Deputy Attorneys General, for Plaintiff and Respondent.

Following a jury trial, defendant and appellant Anthony Mendoza Faulkner was convicted of first degree murder (Pen. Code, § 187, subd. (a)).[1]  The jury also found defendant personally used a deadly weapon (a knife) in the commission of the crime (§ 12022, subd. (b)(1)).  Defendant was sentenced to a prison term of 25 years to life for murder plus one year for the weapon enhancement.

Defendant contends reversal of the judgment is warranted on two grounds—there was insufficient evidence of premeditation and deliberation necessary for first degree murder and, in the alternative, his trial attorney's failure to object to the trial court's handling of a jury question regarding intent to kill deprived him of his constitutional right to effective representation.  We hold the circumstances of the crime supported a finding of premeditation and deliberation and the lack of an objection by counsel to the trial court reinstructing the jury in a manner consistent with CALCRIM No. 521 (an accurate statement of the law) did not amount to ineffective representation.

## FACTS[2]

## I. Prosecution

### A. *The Victim*

Marciano Nuno testified at the preliminary hearing but by the time the case went to trial he had passed away from the

---

[1]     Further statutory references are to the Penal Code.

[2]     The summary of facts is limited to those that are relevant to the issues on appeal.  Thus, we have omitted certain details regarding medical procedures performed on the victim after he was assaulted as well as some evidence concerning the investigation/apprehension of defendant.

injuries caused by two stab wounds. His preliminary hearing testimony was read to the jury; it is summarized in the following paragraph.

In mid-April 2019 at around 5:00 p.m., Nuno[3] was working in downtown Los Angeles as a uniformed security guard at a private parking structure. He carried a baton,[4] pepper spray, walkie-talkie radio, and handcuffs. Nuno received a report from a customer that someone was using drugs on the roof of the structure and investigated. When he reached the roof, he discovered defendant standing on the ledge of the rooftop with a backpack and skateboard. Nuno told defendant he was on private property and needed to leave. Defendant shouted and cursed at Nuno, causing him to radio for assistance. Before his coworkers arrived, defendant stepped off the ledge, hit Nuno with his skateboard, and stabbed him in his torso. Defendant fled toward an exit ramp. Nuno was shown a cellphone video (Video 1) taken by an anonymous woman and testified it accurately depicted his encounter with defendant.

**B.** *Parking Attendant Angela Olvera*

Angela Olvera was responsible for charging patrons of the parking lot a fee as they exited. On April 17, 2019, Olvera observed defendant on a skateboard on the top floor of the parking structure. She left her post, proceeded to the top floor, and "kept telling [defendant] to get off [the ledge]." She was concerned the skateboard may fall over the edge and kill

---

[3] Nuno was 60 years old in April 2019.

[4] A police detective testified the baton was "collapsible" and is considered to be a "non-lethal" weapon by the police department.

someone. Defendant responded to Olvera's instructions by simply staring at her.

Nuno approached defendant and told him to "get down." Defendant stood up, picked up his skateboard, and began walking on the ledge. Olvera heard defendant exclaim, "I'm going to stab the shit out of you." Nuno and Olvera began walking away but when they turned around, defendant "threw himself on [Nuno]"; Olvera thought defendant was "just hitting [Nuno]." Defendant then fled the scene. According to Olvera, Nuno never used pepper spray on defendant and the only item she saw in Nuno's hands was his phone.

A video (Video 2) was acquired by the defense and provided to the prosecutor in February 2023; it was marked as People's Exhibit 4 and played for the jury. Olvera provided narration of the events depicted therein. The video was taken by individuals who appear to be across the street, on or near the rooftop of another building. It shows defendant first striking Nuno with the skateboard and then, with his hand in the formation of a fist, hit/stab Nuno on the side of his body. Those taking the video can be heard laughing with one commenting, "That fool fucked him up."

Security Guard Ricardo Ortega rendered aid to Nuno. After Nuno touched his hand to his side, Olvera saw blood on his hand. Police arrived, and Nuno was transported to a local hospital.

C. *Video 1*

Video 1 was marked as People's Exhibit 2 and was played for the jury. The thumb drive containing the video was on the desk of Los Angeles Police Detective Steve Reyes when he returned to his office after recovering from a work-related injury.

4

The woman who recorded the video made several comments in Spanish while she was filming. A transcript of the voices heard on the video, with translation from Spanish to English when necessary, was provided to the jury.

In response to Nuno's command to "get down," defendant exclaimed "fucking bitch." Nuno again instructed defendant, "Get down. Get down! Get Down!" The transcript documents defendant's response as follows.

> "Fool, you're gonna get fucked up right now. . . . I will stab the shit out of this [u]. What do I care about some cops? [u] fucking bitch [u]. Fucking take that, you motherfucker. [THROWS OBJECT AT MV2] You're about to get fucked up, you stupid fuck. [u]. Come here, motherfucker. [u]!"[5]

We have reviewed Video 1. It shows defendant walking on the parking lot ledge cursing and threatening Nuno after Nuno asks defendant to get down from the ledge. Nuno can be seen walking away from defendant and the ledge. Defendant throws an item toward Nuno, removes an item resembling a knife from his backpack and appears to place it in his left rear pocket,[6] jumps off the

---

5     Brackets are as they appear in the transcript. The references to "[u]" mean the language is unintelligible. There is no dispute that "MV2" is Nuno.

6     The video depicts defendant retrieve the knife from his backpack whereupon he is seen holding it with his left hand in front of his chest. Defendant's hands come together in front of his body before his left hand retreats to his left rear pant pocket. It is unclear whether the knife was placed in his back left pocket

ledge, quickly approaches Nuno, and strikes Nuno with his skateboard.  A struggle ensues whereupon defendant, with his right forearm at an approximate 90-degree angle with his upper arm, thrusts his forearm forward and stabs Nuno in his left torso.  Defendant then stretches his right arm back behind his back and forcefully brings it forward, stabbing Nuno again in a similar region of his body.

### D.  *The Victim's Injuries*

Nuno suffered two stab wounds to the left side of his torso.  The knife penetrated Nuno's diaphragm, splenic vessels, pancreas, and stomach.  Doctors estimated his blood loss at three liters.  Nuno underwent extensive surgery involving, among other things, the removal of his spleen, repair of a hole in his stomach, and efforts to repair his pancreas.  Afterward, he was intubated and placed on a ventilator.  Leaking pancreatic fluid caused his colon to "fall apart," and fistulas eventually developed.  Additional surgeries were performed on October 29, 2020 and November 9, 2020, followed by hospice care.  On March 21, 2021, Nuno returned to the hospital due to sepsis leading to organ failure.  A stroke followed and he passed away on March 29, 2021.  The coroner concluded the cause of death was "bacteria and complications of torso stab wounds" that resulted in "sepsis and multiple organ failure."

### E.  *The Arrest*

On January 15, 2020, two Los Angeles police officers on patrol recognized defendant from a crime bulletin.  They exited the patrol car and ordered defendant to stop.

---

or was transferred to his right hand when his two hands came together in front of his body.

Defendant fled on his skateboard but was ultimately apprehended; his skateboard was recovered by law enforcement. A folding knife was in defendant's pocket; the crevice of the knife contained a substance that was "presumptively positive for human blood."

## II. Defense

Defendant testified on his own behalf. On the day of the stabbing, he was 28 years old. Defendant was on the parking lot roof because he had a planned meeting with customers who were going to purchase "some weed" [7] from him. He had his skateboard, backpack, and sketchbook with him. When he was approached by Olvera, he "had just smoked" marijuana and was sketching a street sign in his sketchbook.

Olvera made a comment to defendant in Spanish that he was unable to understand. He started walking away but, at some point, he turned around and saw a security guard (Nuno) approaching him while shaking a can of pepper spray.

Nuno spoke aggressively and only in Spanish. Defendant could not understand him. In preparation to leave, defendant began gathering his belongings. Nuno leaned on the hood of a car and sprayed defendant's neck and face with pepper spray. As a result, defendant estimated his vision was about 30 percent damaged.

---

[7] The record reflects the words "weed" and "marijuana" are used interchangeably. It is common knowledge that "weed" is a reference to marijuana. (*People v. Lopez* (1967) 254 Cal.App.2d 185, 191.)

As defendant was wiping his face with his beanie, Nuno began swinging his baton, ultimately striking defendant's ankle. Defendant "got mad" but continued to pack up. He exclaimed, "Leave me the fuck alone." Defendant maintained it was at this point that Video 1 begins.

Defendant took out his knife, with the blade closed inside the handle, showed it to Nuno and commented, "Fool, you're going to get fucked up right now."[8] He put the knife back in his pocket, whereupon Nuno struck him with the baton on his kneecap and thigh. Nuno went to the rear of a vehicle and attempted to pepper spray defendant but missed. Defendant heard someone making a comment about calling the police; he responded, "I don't give a fuck about the police," and "I'm going to fuck you up." Although not depicted on Video 1, defendant testified two or three additional security guards were also approaching him.

Defendant attempted to leave by maneuvering between cars, but Nuno blocked his path. While defendant was trapped between parked cars, Nuno emptied the pepper spray can on him. Defendant said, "Come here mother fucker" and then charged Nuno with his skateboard in hand; he swung the skateboard toward Nuno's hands and knocked the pepper spray to the ground. Although Nuno did not have his baton out, defendant believed Nuno was going to kill him with it.

Defendant intended to run away but Nuno grabbed him. Defendant used his left hand to grab the knife out of

---

[8] There was a thumb knob on the side of the knife that needed to be pressed to release the blade and lock it into place.

his left pocket; he opened the blade as he was transferring the knife to his right hand.  He swung the blade toward Nuno but was not certain he connected, so he swung a second time, whereupon Nuno released defendant.  Defendant fled the scene knowing that he stabbed Nuno.

Defendant testified Video 2, taken from an "adjacent building on [a] higher floor," was filmed by "fellow graffiti writers" who he did not know.  A friend of those involved in filming the video told defendant about its existence and gave it to defendant after he was arrested and jailed.

Defendant never provided law enforcement with an account of events that matched his trial testimony.  In fact, he told detectives he was not at the parking structure on the day Nuno was stabbed and that he never stabbed anyone.

## DISCUSSION

## I.  Sufficient Evidence of Premeditation and Deliberation

### A.  *Standard of Review*

"'In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one.  '"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'"'  [Citation.] '"Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the

9

exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.'" [Citation.]" (*People v. Alvarez* (2025) 18 Cal.5th 387, 470.)

### B. *Premeditation and Deliberation*

Murder is the unlawful killing of another with malice aforethought. (§ 187, subd. (a); *People v. Rangel* (2016) 62 Cal.4th 1192, 1220.) "'First degree murder "has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty." [Citation.] These elements require "more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death." [Citation.] ""'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .'""" [Citation.]" (*People v. Alvarez*, *supra*, 18 Cal.5th at p. 470.)

In assessing whether there was sufficient evidence of premeditation and deliberation courts routinely turn to the "'*Anderson*[9] analysis.'" (*People v. Alvarez*, *supra*, 18 Cal.5th at pp. 470–471; see also *People v. Barrett* (2025) 17 Cal.5th 897, 965.) This approach assesses whether there existed evidence of planning, motive, manner of killing, or

---

**9** *People v. Anderson* (1968) 70 Cal.2d 15, 26–27.

any other evidence that supported "'"'"an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse.  [Citation.]"'"'" (*People v. Alvarez, supra*, 18 Cal.5th at pp. 470–471.)  The analysis is "descriptive, not normative" such that it operates as a guideline (*id*. at p. 471) and does not mandate evidence of each indicator of premeditation and deliberation to warrant affirmance of the judgment. (*People v. Pride* (1992) 3 Cal.4th 195, 247 ["*Anderson* does not require that these factors be present in some special combination or that they be accorded a particular weight"].)

　　We turn to the evidence upon which a rational trier of fact could have determined the stabbing of Nuno was preceded by defendant's premeditation and deliberation.

　　1.  *Planning Activity*

　　Defendant testified that, before he committed the stabbing, he showed Nuno his knife; indeed, Video 1 shows defendant holding what appears to be an unopened folding knife in front of his chest while standing on the ledge and screaming at Nuno.  By doing so, defendant planted the seed that an attack was on the horizon.  That seed sprouted verbal threats evincing defendant's plan:  "Fool, you're go[ing] to get fucked up right now . . . I will stab the shit out of this . . . You're about to get fucked up, you stupid fuck. . . . Come here, motherfucker."  Threats are evidence of planning.  (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1028; *People v. Martinez* (1987) 193 Cal.App.3d 364, 371.)

　　Video 1 supported a finding that the stabbing was the result of a preconceived plan in another way—it shows defendant removing the item resembling a folding knife

11

from his backpack and either placing it in his left rear pocket or his right hand. Either way the weapon was at the ready. Given the stabbing ensued shortly thereafter as well as defendant's testimony regarding the manner in which he retrieved the knife from his pocket and pressed the thumb knob to release the blade, a reasonable trier of fact could have concluded defendant armed himself with the weapon when he took it from the backpack and that weapon was, in fact, the folding knife used to stab Nuno. Arming oneself with a knife prior to accosting the victim supports an inference that the assailant planned a violent encounter. (*People v. Elliot* (2005) 37 Cal.4th 453, 471; see also *People v. Hashaway* (1945) 67 Cal.App.2d 554, 573 [sufficient evidence supported findings of premeditation and deliberation, in part because defendant took a pocket knife out of her pocket and "tried to or did open the pocket knife"], disapproved on another ground by *People v. Sanchez* (1947) 30 Cal.2d 560, 572.)

Defendant suggests there was "no evidence" of planning activity because of how quickly the pre-stabbing events transpired. But, "[t]he act of planning–involving deliberation and premeditation–requires nothing more than a 'successive thought[] of the mind.' [Citations.]" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 658.) It is of no consequence that displaying the knife, threatening comments, and preparing the knife for attack occurred in quick succession. (*People v. Alvarez, supra*, 18 Cal.5th at p. 470 [plan may be rapidly and coldly formed].)

## 2. *Motive*

California law has "'"never required the prosecution to prove a specific motive before affirming a judgment, even one of first degree murder.  A senseless, random, but premeditated, killing supports a verdict of first degree murder." [Citation.]' [Citation.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 421–422.)  Nonetheless, there was evidence of defendant's motive.

The jury could have easily inferred defendant's motive was to retaliate against Nuno for ordering him off the ledge and attempting to have him vacate the property.  Defendant testified that, when he was approached by Olvera, he had just smoked marijuana, was drawing a street sign in his sketchbook, and was waiting for customers to arrive and purchase his marijuana.  People who defendant identified as his fellow graffiti writers were across the way with cell phone in hand waiting to film anything entertaining.  Although defendant largely ignored Olvera, his comfort and enjoyment was interrupted by Nuno's more forceful demands.  In addition, Nuno's efforts to get defendant off the ledge and leave the property meddled with his opportunity to profit from the sale of marijuana to anticipated customers.  Defendant was angered by Nuno's unwelcome interference with his plans for the evening.

Video 2 revealed a potential secondary motive.  Defendant was provided with the video by an acquaintance of those who filmed it.  At a minimum, this suggested defendant was connected to the individuals in the adjacent building by a mutual friend.  Those taking the video can be

13

heard laughing as they commented, "That fool fucked him up. From this evidence, a rationale trier of fact could have concluded that defendant knew his fellow graffiti writers were watching him and was motivated to grandstand for them by attacking Nuno. Video 2 demonstrates such an objective was accomplished in that the individuals in the adjacent building were entertained by defendant striking and stabbing Nuno.

Defendant argues any motive was rashly formed out of anger rather than reflection. While this is a possibility, a rational jury could have found defendant's motive to kill was not unconsidered or impulsive in that, after Nuno repeatedly ordered defendant off the ledge, defendant showed Nuno the knife, threaten to "stab the shit out of [him]," and ultimately carried out his threat. The fact that another inference could be drawn from the evidence is of no consequence in assessing the sufficiency of evidence to support a jury verdict. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139.)

To the extent defendant suggests a killing while angry necessarily negates premeditation and deliberation, he is mistaken. While this may be true in some circumstances (see *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1268 [two-minutes of loud screaming argument with girlfriend preceded boyfriend shooting her], it is also true that "[a]nger at the way the victim talked to [his assailant] . . . may be sufficient" to show that the assailant acted with a conscious motive to kill (*People v. Miranda* (1987) 44 Cal.3d 57, 87 [defendant shoots victims

14

after becoming angry with them because they were rude and refused to sell him beer]).

### 3. *Manner of Killing*

Quoting portions of *People v. Alcala* (1984) 36 Cal.3d 604, 626, defendant argues the two "rapid stab wounds" are just "'as consistent with a sudden, random, "explosion" of violence'" as they are with "'a calculated murder.'" First, in context, *Alcala* was simply pointing out that killing in a brutal way cannot *alone* support a finding of premeditation and deliberation; it did not hold that the manner of killing can never be indicative of premeditation and deliberation. (*Ibid.*; see also *People v. Williams* (2018) 23 Cal.App.5th 396, 410 [although the jury could have found the murder was "emotional" and "berserk," it was not required to do so].) As we have already explained, the manner of killing—two stabbings to the abdomen—does not stand alone to support premeditation and deliberation. Rather, it is considered in conjunction with evidence of planning and motive.

Second, defendant's position invites us to reweigh the evidence and to reach a conclusion more favorable to him. This is inappropriate. (*In re Caden C.* (2021) 11 Cal.5th 614, 640 [appellate court "should 'not reweigh the evidence'" when reviewing factual determinations for substantial evidence]; *People v. Alexander* (2010) 49 Cal.4th 846, 883 [same].) To reiterate, we are not concerned with whether the circumstances might also support a finding contrary to the jury's verdict. (*People v. Ceja, supra*, 4 Cal.4th at p. 1139.) Rather, "'"[t]he relevant question is whether, after viewing the evidence in the light most

15

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.]' . . . .[Citation.]" (*People v. Alvarez*, *supra*, 18 Cal.5th at p. 478.) We follow that guideline and turn to the circumstances of defendant's attack to assess whether they are indicative of an intent to kill and may support a finding of premeditation and deliberation. (See *People v. Memro* (1995) 11 Cal.4th 786, 863–864 [manner of killing may "support a conclusion that the evidence sufficed for a finding of premeditated, deliberate murder"].)

Video 1 shows defendant initially stab Nuno by thrusting his right forearm forward toward Nuno's left torso. Defendant then elected to initiate an even more forceful stab by extending his right arm behind his back and using the momentum of his body weight to carry it forward and initiate a more potent connection to the same general area of Nuno's body. Nuno lost three liters of blood after the knife penetrated his diaphragm, splenic vessels, pancreas, and stomach.

A reasonable jury could infer that defendant's lethal objective was not satisfied with just one thrust of the knife to Nuno's abdomen and therefore he chose to wind up his right arm and connect a second time but with greater force. The way defendant (a young adult) attacked and stabbed Nuno (a 60-year-old man) in the abdomen evinced defendant's intent to kill. (*People v. Potts* (2019) 6 Cal.5th 1012, 1028 ["'plunging a lethal weapon into the chest evidences a deliberate intention to kill'"]; *People v. Moore* (2002) 96 Cal.App.4th 1105, 1114 [forceful stab to abdomen

16

("an extremely vulnerable area of the body"), as opposed to an arm or leg, is consistent with an intent to kill].)

Another component of the stabbing that aligns with an intent to kill is the absence of any threat Nuno posed to defendant. Nuno's objective was clear; he simply sought to have defendant get off the ledge and leave the private property Nuno was employed to protect. He was walking away from defendant when he turned around to find defendant ready to attack. Nuno was not holding his collapsable baton and assuming he had pepper spray in his hand (as opposed to his phone per the testimony of Olvera), it had been knocked to the ground. The decision made by defendant to initially defy the legitimate request of Nuno get off the ledge and, rather than leave the property, to follow Nuno and attack him with deadly force is entirely consistent with a premeditated and deliberate murder. (See, e.g., *People v. Silva* (2001) 25 Cal.4th 345, 369 [multiple gunshots on an unarmed defenseless victim who poses no threat to the assailant constitutes a manner of killing that is committed with premeditation and deliberation].)

### C. *Conclusion*

A rational trier of fact could have found the evidence showed defendant committed a premeditated and deliberate murder. While the evidence may support a contrary finding, it is not our role to reweigh the evidence where, as here, the circumstances of the killing reasonably justified the jury's verdict. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

17

## II. Ineffective Assistance of Counsel

### A. *The Jury Question*

The trial court instructed the jury with CALCRIM No. 521, the definition of first degree murder. In part, it provided that the defendant is guilty of first degree murder if the prosecution proves the defendant acted "willfully, deliberately, and with premeditation" and explained "[t]he defendant acted willfully if he intended to kill."

During deliberations the jury sent a note asking, "Can we interpret the . . . word '[k]ill' into '[a]ction' that resulted in death[?]" The trial court commented, "they're essentially asking whether they could interpret the . . . word 'kill' . . . into the action that caused death. I don't think they can. . . . [W]hen you're talking about first degree murder, and express malice aforethought it has to be intent to kill. It doesn't have to be a threat to take the action that ultimately results in death." Over the prosecutor's objection, and with defense counsel's acquiescence, the trial court provided the jury with a written response that parroted CALCRIM No. 521: "For the purpose of first-degree [*sic*] murder, the defendant acted willfully if he intended to kill." The jury notified the court that it had a verdict approximately 30 minutes after it informed the bailiff that it had a question for the court, and less than 20 minutes after the trial court provided the jury with its response.[10]

---

**10** The record reflects the jury notified the court that it had a question at 2:50 p.m. The court went on the record to discuss the question with the parties at 3:03 p.m. At 3:20 p.m., the jury notified the court that it had reached a verdict.

**B. *Defendant Did Not Receive Ineffective Representation***

"In order to establish a claim for ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient and that the defendant suffered prejudice as a result of such deficient performance. [Citation.]" (*People v. Mickel* (2016) 2 Cal.5th 181, 198, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687–692.) To show deficient performance, the defendant must demonstrate "counsel's performance fell below an objective standard of reasonableness . . . under prevailing professional norms. [Citation.]" (*People v. Mickel, supra*, 2 Cal.5th at p. 198, internal quotation marks omitted.) Prejudice requires "a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. [Citations.]" (*Ibid.*)

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) The record

19

does not expressly reveal counsel's strategy, nor is there any indication the trial court made such an inquiry. Nonetheless it is clear that the absence of an objection to the trial court's proposed answer did not fall below professional norms.

Section 1138 allows a deliberating jury to return to the courtroom if they have a disagreement on any point of law arising in the case. "'When a jury asks a question after retiring for deliberation, " . . . [s]ection 1138 imposes upon the court a duty to provide the jury with information the jury desires on points of law." [Citation.] But "[t]his does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under . . . section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." [Citation.]'" (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1016–1017.)

We interpret the jury question in a way that is consistent with the trial court's oral commentary. The jury's note demonstrated it was wondering whether, for purposes of first degree murder, "intent to kill" as required for a showing of a willful act was the equivalent of an intention to take an "action" that "resulted in death." The initial instructions were full and complete thereby leaving the trial court with the discretion to decide what, if any, additional explanation was necessary.

The trial court properly refocused the jury to the requirement that, to act willfully, there must be an intent to kill. Defense counsel understandably welcomed that

20

redirection rather than allowing the jury to expand the scope of the mental state necessary for first degree murder. The rapidity of the jury's verdict after the trial court provided its response— with no additional questions— suggests the jury received the clarification it needed. (See *Weeks v. Angelone* (2000) 528 U.S. 225, 234 [response to jury's question which was limited to directing the jury's attention to a portion of an instruction already given was proper where the "jury did not inform the court that after reading the relevant paragraph of the instruction, it still did not understand its role"].) Any objection to the trial court addressing the jury's question with an accurate statement of the law that targets the jury's concern would have been both unwise and without merit.[11] (*People v. Price* (1991) 1 Cal.4th 324, 387 [defense counsel's failure to

---

[11] Defendant's discussion of his trial attorney's strategy includes multiple quotations from cases addressing ineffective assistance of counsel but is short on an analysis of how trial counsel should have approached the trial court's proposed answer to the jury's question. It is not until the last line of the discussion on counsel's performance that defendant asserts, "The simple and direct answer to the jury's question is, 'No, intent to kill requires that the defendant intended the fatal consequences of his action.'" His proposed response sends a similar message to the jury as the trial court's answer but it does so in a circular way, i.e., "intent to kill" requires the intent to impose "fatal consequences"—there is no link to the requirement of a willful act. Defendant does not develop an argument that dissects and compares the two approaches to the jury question in a way that demonstrates counsel's acquiescence to the court's response violated his Sixth Amendment right to effective representation.

make futile objections or motions does not amount to deficient performance].)

Finally, even if defendant's trial attorney somehow erred by accepting the trial court's decision to reinstruct the jury with language from CALCRIM No. 521, any error was harmless. First, defendant does not dispute that the court's instruction constituted an accurate statement of the law, and it is presumed the jury followed this proper statement of the law in finding defendant harbored the requisite mental state for first degree murder. (*People v. Johnson* (2015) 61 Cal.4th 734, 772 [where nothing in the record suggests the court's instructions were not followed, the presumption that the jury adhered to the instructions is unrebutted].)

Second, the preceding section outlines the evidence that supported a finding of premeditation, deliberation, and intent to kill. We need not repeat it here. Suffice it to say that it was strong enough to overcome any misstep by defendant's trial attorney on how to respond to the jury's question.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


                                 KUMAR, J.[*]

We Concur:


HOFFSTADT, P. J.


KIM (D.), J.

---

[*]     Retired Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.